JEFFREY N. WILLIAMS (SBN 274008)
jwilliams@wargofrench.com
WARGO & FRENCH LLP
601 S. Figueroa St., Suite 4625
Los Angeles, CA 90017
Tel: (310) 853-6300
Fax: (310) 853-6333

Attorneys for Defendant
OMAZE, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREAS KNÜTTEL, MATTHEW JURANEK, AND ADRIANA CARLIN as individuals, on behalf of themselves, the general public and those similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>OMAZE, INC., a Delaware Corporation,<br><br>        Defendant. | Case No. 5:21-cv-02726<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>[Declaration of Jessica Segal and Request for Judicial Notice filed concurrently herewith]<br><br>Date: July 29, 2021<br>Time: 2:00pm<br>Courtroom: 6<br><br>Complaint Filed: April 15, 2021<br><br>Hon. Jon S. Tigar |

1     TO ALL PARTIES HEREIN AND THEIR COUNSEL OF RECORD:

2     PLEASE TAKE NOTICE THAT on July 29, 2021, at 2:00pm in Courtroom 6

3 of the United States District Court for the Northern District of California, 1301 Clay

4 Street, Oakland, California, Defendant Omaze, Inc. ("<u>Omaze</u>") shall move and hereby

5 moves the Court for an order dismissing the Complaint filed by Plaintiffs Andreas

6 Knüttel, Matthew Juranek, and Adriana Carlin ("<u>Plaintiffs</u>") with prejudice pursuant

7 to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]   This Motion is made on

8 the following grounds.

9     <u>First</u>, Plaintiffs' claims for violation of California's consumer protection

10 statutes fail because reasonable consumers could not have been misled by Omaze's

11 disclosures; Plaintiffs have failed to meet their pleading burden under Rule 9(b) to

12 establish that Omaze's disclosures actually caused any of their supposed injuries; and

13 Omaze's promotional sweepstakes comply with all relevant laws and are not "illegal

14 lotteries" under governing law.

15     <u>Second</u>, Plaintiffs' common-law fraud claim fails for the same reasons as the

16 foregoing, in addition to the fact that Plaintiffs cannot properly allege the required

17 element of scienter.

18     <u>Third</u>, Plaintiffs' unjust enrichment claim fails because Plaintiffs received the

19 benefit of their bargain, and unjust enrichment is not a proper theory to pursue claims

20 that a person was misled into seeking that bargain in the first instance.

21     <u>Fourth</u>, all of Plaintiffs' claims fail because Plaintiffs suggest that if not for

22 Omaze's alleged misrepresentations, they would simply have donated directly to

23 charity while entering Omaze's sweepstakes for free.  Plaintiffs therefore lack

24

25

---

26 [1] Omaze has concurrently filed two other motions: a motion to strike Plaintiffs' nationwide class allegations under Rules 12(f) and 23, and a motion to dismiss for

27 improper venue or to transfer venue to the Central District of California.  Omaze has raised all arguments at the same time to preserve them, but respectfully requests that

28 the Court consider the venue motion as a threshold matter.

standing because they admit that they would be in the same position in either event (rather, their theory suggests that the charities are the injured parties).

Fifth, all of Plaintiffs' claims fail because the remedies they seek would impose civil liability on a professional charitable fundraiser for purportedly failing to disclose in its advertisements exactly how much of each donation goes to charity, or would impose a mandatory injunction requiring such disclosures.  Long-standing Supreme Court precedent holds that any such requirement would be flatly unconstitutional as a violation of the fundraiser's First Amendment rights.

Finally, sixth, to the extent that Plaintiffs' allegations attempt to predicate liability on conduct occurring outside the applicable statute of limitations—four years at most, based on Plaintiffs' asserted claims—those allegations are irrelevant and any claims based thereon should be dismissed.  Alternatively, those allegations should be stricken under Rule 12(f).

This Motion is based upon this Notice of Motion and attached Memorandum of Points and Authorities, the Declaration of Jessica Segal ("Segal Decl.") and Request for Judicial Notice ("RJN") filed concurrently herewith, the complete files and records in this action, and upon such other matters as the Court may allow.

Dated:  June 14, 2021                          WARGO & FRENCH LLP

                                                        By:  */s Jeff Williams*
                                                                JEFFREY N. WILLIAMS

                                               Attorneys for Defendant Omaze, Inc.

# **TABLE OF CONTENTS**

**Page No.**

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES............................................................................ iii

MEMORANDUM OF POINTS AND AUTHORITIES................................................. 1

I.    INTRODUCTION.............................................................................. 1

II.   STATEMENT OF FACTS................................................................... 2

      A.    Sweepstakes Disclosures................................................. 3

      B.    Funding Disclosures........................................................ 5

      C.    Plaintiffs' Allegations ..................................................... 7

III.   LEGAL STANDARD......................................................................... 9

IV.   ARGUMENT .................................................................................. 9

      A.    Plaintiffs' CLRA, UCL, and FAL Claims Fail Because a Reasonable Consumer Could Not Plausibly Have Been Deceived by Omaze's Disclosures, Plaintiffs Fail to Plausibly Allege Omaze Caused Them Harm, and Omaze Has Committed No Unlawful Conduct ................... 10

            1.    A reasonable consumer would have understood that a portion of his or her donation would be used to pay fees and expenses relating to the sweepstakes. ........................................... 11

            2.    A reasonable consumer would have understood how many entries they were to receive, how to enter for free, and how free and paid entries were treated (that is to say, equally). .......... 13

            3.    Plaintiffs fail to allege a causal nexus between the allegedly misleading disclosures and their supposed injury. ....................... 14

            4.    Plaintiffs cannot show any unlawful conduct because Omaze's fundraising model is a legal promotional sweepstakes, not an "illegal lottery," and complies with all disclosure requirements. 16

      B.    Plaintiffs' Fraud Claim Fails for the Same Reasons as Their Fraud-Based Consumer Protection Claims........................................ 20

      C.    Plaintiffs' Unjust Enrichment Claim Lacks a Cognizable Basis ........... 21

      D.    Plaintiffs' Claims All Fail Because Plaintiffs Lack Standing to Sue for Alleged Injuries to the Designated Charities .................................... 21

      E.    Plaintiffs' Claims All Fail Because the Remedies They Seek Unconstitutionally Infringe on Omaze's First Amendment Rights........ 23

**MOTION TO DISMISS**

F.   Plaintiffs' Complaint Improperly Rests on Conduct Outside of the Applicable Limitations Period ................................................................. 25

V.  CONCLUSION .................................................................................................... 26

**MOTION TO DISMISS**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page No.**

**Cases**

*Andren v. Alere, Inc.,*
   207 F. Supp. 3d 1133 (S.D. Cal. 2016) ................................................................. 16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................................ 9

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................................ 9

*Bower v. AT&T Mobility, LLC,*
   196 Cal. App. 4th 1545 (2011) ................................................................. 15, 20, 22

*California Gasoline Retailers v. Regal Petroleum Corp.,*
   50 Cal. 2d 844 (1958) ....................................................................................... 14, 17

*Canales v. Fed. Home Loan Mortg. Corp.,*
   Case No. CV 11–2819, 2011 WL 3320478 (C.D. Cal. Aug. 1, 2011) ................... 25

*Davidson v. Kimberly-Clark Corp.,*
   889 F.3d 956 (9th Cir. 2009) ............................................................................. 9, 15

*Derbaremdiker v. Applebee's,*
   No. 12-CV-01058 KAM, 2012 WL 4482057 (E.D.N.Y. Sept. 26, 2012) ......... 13, 21

*Dinan v. Sandisk LLC,*
   No. 18-CV-05420-BLF, 2019 WL 2327923 (N.D. Cal. May 31, 2019) .......... 11, 14

*Ebner v. Fresh, Inc.,*
   838 F.3d 958 (9th Cir. 2016) .................................................................................. 11

*Fagerstrom v. Amazon.com, Inc.,*
   141 F. Supp. 3d 1051 (S.D. Cal. 2015) ................................................................. 13

*Freeman v. Time, Inc.,*
   68 F.3d 285 (9th Cir. 1995) ............................................................................. passim

*Hadley v. Kellogg Sales Co.,*
   243 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................. 10

*Harshbarger v. Philip Morris, Inc.,*
   No. 02–05267, 2003 WL 23342396 (N.D. Cal. Apr. 1, 2003) ............................... 25

*Haskell v. Time, Inc.,*
   857 F. Supp. 1392 (E.D. Cal. 1994) ................................................................. 11, 12

*In re Sony Gaming Networks*,
   903 F. Supp. 2d 942 (S.D. Cal. 2012) ................................................................ 21

*Lavie v. Procter & Gamble Co.*,
   105 Cal. App. 4th 496 (2003) ............................................................................ 10

*Miller v. Yokohama Tire Corp.*,
   358 F.3d 616 (9th Cir. 2004) ............................................................................. 16

*Ouiby Inc. v. Posey*,
   No. 17-CV-03847-EMC, 2018 WL 732493 (N.D. Cal. Feb. 6, 2018) ............. 21, 22

*People v. Shira*,
   62 Cal. App. 3d 442 (1976) ........................................................................... 17, 18

*Peterson v. Cellco P'ship*,
   164 Cal. App. 4th 1583 (2008) .......................................................................... 21

*Riley v. Nat'l Fed. Of the Blind of North Carolina*,
   487 U.S. 781, 108 S. Ct. 2667 (1988) ................................................ 12, 15, 23, 24

*Secretary of State of Maryland v. Joseph H. Munson Co.*,
   467 U.S. 947, 104 S. Ct. 2839 (1984) ............................................................... 15

*Sperling v. Stein Mart, Inc.*,
   No. 15-01411, 2016 WL 8925347 (C.D. Cal. Jan. 26, 2016) ............................ 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S.Ct. 2499 (2007) .................................................................. 9

*Weisberg v. Takeda Pharm. Co. Ltd.*,
   No. CV 18-784 PA (JCX), 2018 WL 6219879 (C.D. Cal. May 7, 2018) ............. 15


**Statutes**

Cal. Bus. Prof. Code § 17208 ................................................................................ 25

Cal. Bus. Prof. Code § 17537.1 ............................................................................. 19

Cal. Bus. Prof. Code § 17539.1(a)(1) .................................................................... 19

Cal. Bus. Prof. Code § 17539.1(a)(3) .................................................................... 19

Cal. Bus. Prof. Code § 17539.1(a)(4) .................................................................... 19

Cal. Bus. Prof. Code § 17539.1(a)(7) .................................................................... 19

Cal. Bus. Prof. Code § 17539.15(j) ....................................................................... 19

Cal. Bus. Prof. Code § 17539.5(e).......................................................................... 19

Cal. Civ. Code § 1780(a) ....................................................................................... 16

Cal. Civ. Code § 1783 ............................................................................................ 25

Cal. Civ. Proc. Code § 338(d) ............................................................................... 25

Cal. Gov't Code § 12580 .......................................................................................... 7

Cal. Pen. Code § 319 .............................................................................................. 16

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 9

Fed. R. Civ. P. 12(f) ............................................................................................... 25

Fed. R. Civ. P. 9(b) .................................................................................................. 9

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Omaze is a professional charitable fundraiser that has raised over $150 million to support over 350 charities around the world.  Because charities are often unable or not well-situated to implement marketing solutions to maximize charitable donations, Omaze's innovative approach provides a full suite of turnkey services for its clients focused on storytelling and removing the friction from fundraising.  Omaze works with its charity clients to design, administer and implement online sweepstakes giveaways to promote their charitable work to a large audience of potential donors. Omaze's marketing team designs content and creates advertisements for these giveaways, its customer experience team handles inquiries from donors, and its technology team builds and maintains the platform through which individuals can make donations or enter for free, as well as the dashboard by which donors and potential donors can track their contributions.  Per one client: "Omaze provides marketing, content, tech and fulfillment services we simply can't afford or get anywhere else.  It's these investments and expertise that drive the huge return."

This novel and effective method of charitable fundraising has now drawn the attention of consumer class-action counsel and resulted in the filing of the instant Complaint.  Plaintiffs and their counsel seek to represent massive California and nationwide classes composed of essentially every individual that has ever donated through Omaze, claiming that if not for Omaze's supposedly-misleading website disclosures they would never have donated to charity.  Plaintiffs demand Omaze compensate them for all prior donations and seek broad injunctive relief.

Plaintiffs' Complaint, however, does not set forth a plausible theory of how reasonable users could possibly be deceived by the disclosures on Omaze's website, much less does it connect the dots by establishing with particularity how any alleged misrepresentations actually caused Plaintiffs any harm.  Rather, the Complaint cobbles together irrelevant and manufactured "background" allegations, then lobs

generalized contentions that Omaze's sweepstakes model violates criminal statutes pertaining to "illegal lotteries," various consumer protection statutes, and doctrines of fraud and unjust enrichment.  By the time Plaintiffs' *actual* experiences with Omaze are even described—on the twenty-third page of the Complaint—all pretense of showing any nexus between these manufactured allegations and Plaintiffs' supposed harm dissolves into threadbare and conclusory language.  Plaintiffs also attempt to pick-and-choose which disclosures from Omaze's website to rely upon for their Complaint.  Ultimately, however, their claims that Omaze misled them into donating to charity are flatly incongruent with the clear and full set of disclosures.

For this and other reasons, Plaintiffs' claims are subject to dismissal.  For example, their claims under California's consumer protection statutes—which must be alleged with particularity—fail because reasonable consumers could not have been misled by Omaze's disclosures; Omaze's promotional sweepstakes comply with all relevant laws and are not an "illegal lottery;" and to the extent Plaintiffs claim that absent the purported conduct they would simply have donated directly to charity, they admit they have not suffered a cognizable injury in any event.  Plaintiffs' claims for fraud and for unjust enrichment fail for similar reasons, including that Plaintiffs undisputedly received what they bargained for from Omaze.  Finally, all of Plaintiffs' claims are subject to standing and constitutional defenses mandating dismissal.  The Complaint should therefore be dismissed with prejudice.

## II.   STATEMENT OF FACTS

The Complaint alleges that Omaze is a professional charitable fundraiser providing services that have helped raise tens of millions of dollars for charitable organizations.  ECF No. 1 ("Complaint" or "Compl.") ¶¶ 27, 48.  Through its online platform, Omaze uses sweepstakes as a tool to raise money for charity, offering participants the chance to win prizes, such as cars or vacation packages, or to share an experience with a celebrity.  Compl. ¶¶ 27-28.  Omaze advertises its sweepstakes through its website, e-mails, and social media advertisements.  Compl. ¶¶ 27, 32.

Participants can enter a sweepstakes by choosing to make a donation and selecting a contribution amount—for which they receive a designated number of entries as a thank you—or by free alternative method of entry ("AMOE").  Compl. ¶¶ 38, 79.  Omaze discloses in multiple prominent locations throughout the browsing and donation process that "No donation or payment is necessary to enter or win this sweepstakes" and that "NO PURCHASE, PAYMENT, OR DONATION OF ANY KIND IS NECESSARY TO ENTER OR WIN.  A PURCHASE, PAYMENT, OR DONATION WILL NOT INCREASE THE CHANCES OF WINNING."  E.g., Compl., Ex. A; Segal Decl., Exs. 1-9 (capitalization in original).

Plaintiffs allege that they each participated in Omaze sweepstakes by making donations to enter and, therefore, relied on information and material that was set forth on or omitted from Omaze's website or through its advertisements.  Compl. ¶¶ 104, 115, 134.  Yet as described below, Omaze provides robust and complete disclosures to participants about how its sweepstakes work, including within dedicated pages on its website for each sweepstakes experience ("Experience Pages") along with its Official Rules, Terms of Use and About Us pages accessible from each section of the Omaze website.  Compl. ¶¶ 28, 31, 41.

### A.     Sweepstakes Disclosures

A user of the Omaze website ***must*** navigate an Experience Page to enter a sweepstakes, and Plaintiffs admit not only doing so but indeed that they "rel[ied] on" the Experience Pages when entering the sweepstakes in question.  Compl. ¶¶ 28-30, 106, 118, 128.  In addition to the frequent disclosures that no purchase is necessary to enter any sweepstakes, the Experience Pages disclose, *inter alia*: (i) the prize to be won in the sweepstakes drawing; (ii) the name and a description of the designated charity; (iii) the exact number of entries a participant would receive as a thank-you if they chose to donate a particular amount (*e.g.*, "donate $25" for "250 entries to win"); and (iv) that a participant may "enter without contributing," along with a link to do so online.  Compl, Exs. A-B; Segal Decl., Ex. 1.

1    Each Experience Page also lays out a set of rules particular to that sweepstakes

2  or experience (the "Experience Rules"), prominently demarcated by a large-font,

3  bolded banner stating: "**stuff our lawyers want you to read**."  Compl., Exs. A-B

4  (emphasis in original).  The Experience Rules disclose, *inter alia*: (i) how and when

5  the sweepstakes will be conducted; (ii) the designated charity; (iii) methods of entry

6  and entry limit; and (iv) that the "[o]dds of winning depend on the number of eligible

7  entries received during the Entry Period." *Id.*; Segal Decl., Ex. 1.  The Experience

8  Rules also contain multiple prominent references to the Official Rules, hyperlinked in

9  underlined and different-colored font to the Official Rules on Omaze's website.  *Id.*

10  Below that is a "funding transparency" section relating to disbursement of donations

11  to the designated charity and payment of fees and expenses, etc.  *Id.*  Further, as of at

12  least March 2, 2021, Omaze directs users to and confirms users' acceptance of the

13  Official Rules and Terms of Use prior to making any payment or entering for free by

14  utilizing italicized text and conspicuously set-off hyperlinks, as in the below:

15

16
       Return to cart                 **Continue to payment**

17
*By continuing, you agree to our Terms of Use, Official Rules, Privacy Policy and Refund Policy.*
*For State Disclosure Information, click here.*

18

19  Segal Decl., Ex. 26.

20    The Official Rules—which, in addition to the above, are linked at the bottom of

21  every section of the Omaze website—work in conjunction with the Experience Rules

22  to govern every sweepstakes experience.  Segal Decl., Exs. 2-9.  They provide a

23  prominent disclosure that, for example, there is "NO PURCHASE NECESSARY TO

24  REGISTER FOR OR USE THIS WEBSITE." *Id.*  They describe in detail the

25  procedure for free entry and how entries are awarded in response to a donation.  *Id.*

26  Indeed, even as of 2014—before any of the named Plaintiffs *ever* entered an Omaze

27  sweepstakes—the Official Rules gave clear instructions for free entry by mail while

28  also including a prominently-marked, different-color hyperlink to "view the online

[AMOE].”  Segal Decl., Ex. 9.  The Official Rules also disclose, *inter alia*, (i) the equal weighting of all entries in the prize drawing; (ii) the number of entries provided for free entry; (iii) that “[r]egardless of how you enter,” there is a maximum number of entries that can be reached by free entry or by donation; and (iv) other rules and restrictions pertaining to the conduct of the sweepstakes.  Segal Decl., Exs. 2-9.

The “About Us” page (formerly labeled “How it Works”), which can be accessed via a link at the top or bottom of every single section of Omaze’s website, describes Omaze’s fundraising model in simple, non-legal language.  Segal Decl., Exs. 10-16.  It explains that the “traditional charitable fundraising model” requires that “[n]onprofits are held back from investing in marketing, tech and the top talent that could transform the scale of how they raise funds.”  *Id.*, Ex. 10.  Omaze, by contrast, professionalizes the hard work of fundraising and allows “charities to focus on their world-changing work, so we cover the marketing (all those Instagram ads you see), content (videos with your favorite celebs) and technology (this very website you’re on!) on their behalf.”  *Id.*  There is nothing on Omaze’s website that states or implies Omaze is not reimbursed for expenses or paid for its work out of the proceeds of the sweepstakes; in fact, Omaze clearly discloses the allocation of donated funds (*see* Part II.B, *infra*) and the About Us page explains that Omaze employs a commercial model that is a net benefit to charities:



*Id.*

### B.    Funding Disclosures

Since 2018, Omaze has fundraised for Charities Aid Foundation of America (“<u>CAF America</u>”), a globally-recognized, IRS-registered non-profit, which grants

funds raised by Omaze to designated charitable organizations.  Compl. ¶ 50.  CAF America contracts with Omaze to design and administer a sweepstakes experience, and CAF America thus receives 100% of all the donations.  CAF America then grants a portion of the donations to the sweepstakes' designated charity or charities and pays Omaze agreed-upon fees and expenses.  This arrangement is disclosed ***on the very front page*** of the Omaze website, and again on the "shopping cart" page, as follows:

**DREAM EXPERIENCES. GREAT CAUSES.**

Omaze experiences raise funds for Charities Aid Foundation America ("CAF America"), a US-registered, 501(c)(3) public charity. 100% of donations go to CAF America, which will then grant the donations, minus experience fees and costs, to the nonprofit(s) identified on the experience page. For more info, see the "Fundraising Transparency" section at the bottom of each experience page.

Segal Decl., Exs. 24-26.

In fact, Omaze openly discloses how donor funds are used in ***multiple*** areas on its website.  As indicated on the front page, one of those places is "at the bottom of each experience page"—that is, alongside the Experience Rules, where there is a section prominently labeled "Transparency" or "Fundraising Transparency."  Compl., Exs. A-B; Segal Decl., Ex. 1.  For "Omaze Premiere Experiences . . . 60% of the total donations goes to the Designated Grantee(s) via a grant from [CAF America] . . . [which] retains a small percentage of the total donations (less than 1%) to cover its own operating costs.  Omaze uses the remaining amount to pay for the Experience costs, such as Prize costs, payment processing fees, and advertising to awesome people like you, and to cover our operating costs of providing and maintaining the technology and team that makes this all happen."  Segal Decl., Ex. 1.  For "Omaze Owned Experiences," the allocation of funds is similar except that 15% of total donations go to the Designated Grantee, with more allocated to expenses.  *Id.*[2]

---

[2] Generally, the difference is that Omaze Owned Experiences are those in which Omaze must purchase or pay for the prize (for example, a car or cash prize) and expenses are therefore markedly higher; Omaze Premiere Experiences are those in which the prize is donated (for example, spending a day with a celebrity).

A participant may also find additional information concerning the allocation of donated funds in the "About Us" section of the Omaze website, within a section prominently labeled "Where Your Money Goes":

> When you contribute $10 for the chance to win a celebrity experience (set visit, dinner date, tickets to a premiere, etc.), $6 is donated to charity, $2.50 on average goes towards marketing expenses and credit card fees, and Omaze nets the remaining $1.50. A $10 contribution for the chance to win a prize-based experience (like a car, vacation or tuition) breaks down as follows: $1.50 is donated to charity; $7 typically goes to sourcing and shipping the prize, covering the winner's taxes, marketing the experience, and processing credit card fees; and $1.50 goes to Omaze. These experiences require substantially more resources to secure the prize and help spread the word.

Segal Decl., Ex. 11; *see also generally* Exs. 10, 12-16.

Omaze's Terms of Use have included yet another description of how participants' donations are handled and allocated:

> The net proceeds to be distributed by CAFA as grants is generally equal to the total Donations received in connection with a Campaign less the costs and expenses associated with that Campaign, which include advertising, payment processing, Prize fulfillment (other than Prizes or experiences that are donated), and the costs of making the Campaign a success. In addition, as part of the net proceeds calculation, approximately 15% of every Donation goes to Omaze to cover the cost of providing and maintaining the technology and team that makes this all happen. See the section of each Campaign page called "Stuff Our Lawyers Want You to Read" for the specific calculation of net proceeds applicable to the Campaign.

Segal Decl., Ex. 17; *see also* Exs. 18-23.

**C.     Plaintiffs' Allegations**

Despite all of the foregoing disclosures, Plaintiffs' manufactured allegations in the Complaint go back to *2009*—referring to disclosures Plaintiffs never even saw, much less that would be relevant within any conceivable statute of limitations—to cherry-pick portions of Omaze's website in an effort to malign the very concept of a commercial charitable fundraiser. *E.g.*, Compl. ¶¶ 29-34.[3] The crux is that Omaze's

---

[3] Commercial charitable fundraising is, of course, specifically authorized by state law. Cal. Gov't Code § 12580, *et seq.*, *see also* https://oag.ca.gov/charities/pf/cf.

use of the word "donate" was somehow misleading because Omaze received a portion of the funds to cover fees and expenses. *Id.* ¶¶ 55-59. The Complaint also wrongly suggests that Omaze's sweepstakes are illegal lotteries under California criminal statutes (*id.* ¶¶ 60-75); that Omaze fails to properly disclose how donor entries are weighed in relation to free entries, or how many sweepstakes entries are awarded for different levels of donation (*id.* ¶¶ 76-90); and that Omaze violates California statutes and regulations requiring various disclosures, including the odds of winning any particular sweepstakes (*id.* ¶¶ 91-100).

Yet ***Plaintiffs'*** actual allegations are far less detailed. Mr. Knüttel parrots the foregoing only in highly conclusory terms, stating flatly that he believed that "most of the money he paid went to charity," he believed that "paying to participate in the sweepstakes drawing awarded more entries than 'free' entry," and he was "unable to [enter for free] easily." *Id.* ¶¶ 108-13. He cites no particular reason for any of these "beliefs" other than his "rel[iance] on" the Experience Pages, e-mails, advertisements, and payment page, which purportedly "stated money donated would go to various charities." *Id.* ¶¶ 106-07. Mr. Knüttel claims only that he "would not have purchased these sweepstakes entries, or would have purchased fewer of them" had he known he was "not competing on the same terms" as other participants. *Id.* ¶ 112.

Mr. Juranek and Ms. Carlin make similarly-conclusory allegations. *Id.* ¶¶ 115-38. They add that they found it "impossible to enter for free online, because only paid entries were allowed to enter online,"[4] while Ms. Carlin includes the detail that she "believed that 80%-90% of the money she paid went to charity" but again does not specify what led her to believe this, other than the "donate verbiage." *Id.* Notably, none of the Plaintiffs describe how their purported characterization of Omaze's fundraising model as an "illegal lottery" or Omaze's purported violation of sweepstakes disclosure laws affected them at all.

---

[4] Mr. Knüttel and Ms. Carlin did, in fact, enter certain sweepstakes for free online.

Based on these alleged unlawful acts and conduct, Plaintiffs assert five claims for relief in this case: (i) violation of the California Consumers Legal Remedies Act ("CLRA"); (ii) violation of the California Unfair Competition Law ("UCL"); (iii) fraud, deceit, and/or misrepresentation; (iv) violation of the California False Advertising Law ("FAL"); and (v) unjust enrichment.  Compl. at 31-41.  All of these claims are subject to dismissal for the reasons discussed below.

## III.   LEGAL STANDARD

Under Rule 12 of the Federal Rules of Civil Procedure, a complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 569 (2007).  Because Plaintiffs' UCL, FAL, CLRA and common law fraud claims all sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 964 (9th Cir. 2009).

On a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499 (2007); see also RJN at 1-5.

## IV.   ARGUMENT

The clear goal of Plaintiffs' Complaint is to muddy the waters with enough supposed "facts" regarding Omaze's business practices and/or disclosures—whether or not those disclosures were seen by any of the Plaintiffs or were seen within the limitations period—to distract from the sheer implausibility and conclusory nature of Plaintiffs' actual allegations.  Plaintiffs want to claw back the money they donated to charity on the ground that Omaze's use of the word "donate" misled them to believe

that all or the "overwhelming majority" (Compl. ¶ 151) of the donated funds would go directly to charity, and they pick-and-choose from Omaze's disclosures over the years in an attempt to make this seem reasonable.  A full and fair view of those disclosures evidences that it is not.  Any reasonable consumer would have known that Omaze's commercial charitable fundraising model required portions of each donation to be used to cover fees and expenses relating to the sweepstakes in question.

Plaintiffs' fraud-based claims thus fail for the primary reason that there was no actionable misrepresentation and Plaintiffs fail to identify how Omaze caused them any injury.  Their claim under the UCL's "unlawful" prong fails because Omaze's Plaintiffs can identify no applicable laws that were violated, and their unjust enrichment claim is nonsensical on these facts.  Additionally, all of Plaintiffs' claims should be dismissed because they lack standing to assert claims on behalf of the designated charities, and the remedies Plaintiffs seek infringe on Omaze's First Amendment rights.  Finally, Plaintiffs' claims are barred where predicated on Omaze's supposed conduct occurring outside of the statutory limitations period (to the extent that conduct was even relevant to Plaintiffs' decision to donate).

### A.  Plaintiffs' CLRA, UCL, and FAL Claims Fail Because a Reasonable Consumer Could Not Plausibly Have Been Deceived by Omaze's Disclosures, Plaintiffs Fail to Plausibly Allege Omaze Caused Them Harm, and Omaze Has Committed No Unlawful Conduct

To establish a claim under the CLRA, the fraudulent prong of the UCL, or the FAL, Plaintiffs must plead and prove that "members of the public are likely to be deceived" by Omaze's alleged conduct.  *Freeman v. Time, Inc*., 68 F.3d 285, 289 (9th Cir. 1995); *see also Hadley v. Kellogg Sales Co*., 243 F. Supp. 3d 1074, 1089 (N.D. Cal. 2017) (addressing claims together due to their similarity).  Courts apply the "reasonable consumer" test to determine whether conduct is deceptive or misleading.  *Lavie v. Procter & Gamble Co*., 105 Cal. App. 4th 496, 507 (2003).

Under the reasonable consumer test, "likely to be deceived" means that "it is probable that a ***significant portion*** of the general consuming public or of targeted

1   consumers, acting reasonably in the circumstances, could be misled." *Id.* at 508

2   (emphasis added). It is insufficient to show a mere possibility that some consumers

3   who unreasonably view a statement might misunderstand it. *Ebner v. Fresh, Inc.*, 838

4   *F.3d 958, 965 (9th Cir. 2016)*. Applying this standard, courts have granted motions to

5   dismiss claims under the CLRA, UCL, and FAL on the basis that the conduct alleged

6   was not deceptive as a matter of law. *Freeman*, 68 F.3d at 290; *Haskell v. Time, Inc.*,

7   857 F. Supp. 1392, 1398 (E.D. Cal. 1994); *Dinan v. Sandisk LLC*, No. 18-CV-05420-

8   BLF, 2019 WL 2327923, at *6-8 (N.D. Cal. May 31, 2019).

9             1.   *A reasonable consumer would have understood that a portion of*
                   *his or her donation would be used to pay fees and expenses*
10                 *relating to the sweepstakes.*

11          Plaintiffs initially characterize Omaze's use of the word "donate" as misleading

12   because it leads a participant to believe that "all, or the overwhelming majority" of

13   their donations are going to charity when the "lion's share" is taken by Omaze, and

14   that the involvement of CAF America is used as a "bait-and-switch" to further this

15   mistaken belief. Compl. ¶¶ 49, 55, 58, 151. Yet in all years relevant to this action,

16   Omaze's website contained clear and thorough disclosures describing the allocation

17   of donations made in connection with its sweepstakes. *See* Part II.B, *supra*.

18          For example, the 2017 "How It Works" page clearly disclosed that Omaze's

19   "***for-profit*** model means Omaze receives 20% of net funds," *i.e.*, after payment of

20   expenses, for the type of sweepstakes being offered at the time. Segal Decl., Ex. 15

21   (emphasis added). Similarly, the 2017 Terms of Use disclosed that "[w]hen you

22   make a Donation, a certain percentage of the amount of your donation is retained by

23   Omaze to cover the costs of providing the Services," *e.g.*, "the costs of producing and

24   fulfilling all Prizes and rewards." Segal Decl., Ex. 21 at ¶ 3.

25          In later years, even more disclosures were added directly onto the front page of

26   the Omaze website, into the "About Us" and Terms of Use sections, onto the

27   shopping cart page, and directly onto each Experience Page—including multiple

28   prominent explanations of Omaze's relationship with CAF America and the specific

allocation of each donation under the "**stuff our lawyers want you to read**" heading and the "Fundraising Transparency" or "Transparency" subheading. *See* Compl., Exs. A-B (emphasis in original); Segal Decl., Ex. 1.[5] Omaze's website also discloses in clear, non-legal terms exactly how Omaze's commercial fundraising model results in higher net proceeds to charities than traditional fundraising even if, as Plaintiffs contend, a larger percentage of each donation is used to pay fees and expenses relating to the sweepstakes under Omaze's model. Segal Decl., Ex. 10.

Under Ninth Circuit precedent in *Freeman*, Omaze's use of the word "donate" cannot be misleading as alleged because any reasonable consumer would be on notice that a substantial portion of their donation would be used to pay for the experience and the costs to run the sweepstakes, including Omaze's fee. *See Freeman,* 68 F.3d at 289 (upholding dismissal of plaintiff's UCL and FAL claims that mailer misled plaintiff into thinking he had won a million dollar sweepstakes, because it also disclosed that plaintiff would only win the prize if he had the winning number); *Haskell*, 857 F. Supp. at 1403 (statements concerning dollar amount of sweepstakes prize were not misleading because disclosures also stated the prize was paid in installments and that taxes were paid by the winner, which reduced the dollar amount of the prize). A reasonable consumer's common sense also dictates that some portion of the donations must go to the costs to acquire prizes and run the sweepstakes. *See Riley v. Nat'l Fed. Of the Blind of North Carolina*, 487 U.S. 781, 799, 108 S. Ct. 2667 (1988) (mere fact of fundraiser's professional status provides "notice that at least a portion of the money contributed will be retained"); *see also id.* at 804 ("[D]onors are assuredly aware that a portion of their donations may go to solicitation costs and other administrative expenses—whether the solicitor is a professional, an in-house employee, or even a volunteer…") (Scalia, J., concurring in part).

---

[5] The "Funding Transparency" section is not "buried in the fine print" as Plaintiffs contend. The rules are clearly demarcated by bold, large-font type and there is a section at the top of the Experience Page providing direction. *See* Segal Decl., Ex. 1 ("For more information, see the 'Fundraising Transparency' section below.").

To the extent Plaintiffs allege they did not view some disclosures in whole or part, this does not make them misleading.  The disclosures were contained in governing documents such as the Official Rules.  It is unreasonable as a matter of law for consumers to ignore express disclosures and substitute their own interpretation. *See Freeman*, 68 F.3d at 290 ("[W]hen read reasonably and in context, the promotion makes no such false representation."); *Derbaremdiker v. Applebee's*, No. 12-CV-01058 KAM, 2012 WL 4482057, at *6 (E.D.N.Y. Sept. 26, 2012) ("Because the terms and conditions of the Sweepstakes were fully disclosed in the Official Rules, which consumers were directed to review by both the receipts given to customers and the Website, a reasonable consumer that read the Official Rules as directed would not have been misled by the statements on the receipt."); *Sperling v. Stein Mart, Inc*., No. 15-01411, 2016 WL 8925347, at *8-9 (C.D. Cal. Jan. 26, 2016) (plaintiff's reading of phrase on price tags was implausible given defendant's separate policy explaining the phrase, to which consumers were directed by an asterisk on the price tags and which plaintiff ignored); *Fagerstrom v. Amazon.com, Inc*., 141 F. Supp. 3d 1051, 1070 (S.D. Cal. 2015) ("The test, however, is whether Plaintiffs had a 'reasonable opportunity' to understand important terms, not whether Amazon outlined the terms with maximum clarity . . . The Consumer Rules appear on the first page of the AAA website's listing of rules and require no special web-browsing expertise to locate.").

> 2.   *A reasonable consumer would have understood how many entries they were to receive, how to enter for free, and how free and paid entries were treated (that is to say, equally).*

For the same or similar reasons, Plaintiffs' allegations that Omaze failed to properly disclose how it treats those who enter a sweepstakes via donation as compared to those who enter for free, or how many sweepstakes entries are awarded for different levels of donation, fail to state a plausible claim that a reasonable consumer would be deceived.  Compl., ¶¶ 76-90.

Each Experience Page clearly states how many entries are to be received as a thank you when a user makes a donation (*e.g.*, "donate $25" and receive "250 entries

to win" as a thank you).  Compl., Exs. A-B.  The Official Rules similarly spell out in a section prominently entitled "**Entry Weighting**" exactly how many entries will be received for each free entry, and clearly state that all "entries are treated equally." *E.g.*, Segal Decl., Ex. 6.  The Official Rules also provided clear descriptions of the procedure to enter for free, either by mail or online.  Segal Decl., Exs. 2-9.  Indeed, it was possible to enter for free online at all times relevant to this action.  *See id.*

Therefore, "[w]hat ultimately dooms Plaintiff's claims is that Defendant tells the consumer exactly what she is getting." *Dinan*, 2019 WL 2327923, at *7.  A reasonable consumer would not have been misled by Omaze's clear disclosures, nor can Plaintiffs place their head in the sand and claim that they had no reason to view disclosures as critically important to their sweepstakes entries as the Experience Rules or Official Rules (indeed, they admit "relying on" the Experience Pages on which the Experience Rules resided and which contained multiple prominent hyperlinks to the Official Rules).  Plaintiffs' claims that it was impossible or burdensome to submit a free entry online are also of no merit because: (i) it was not only possible but easy to do so; and (ii) even if online entry was not available, they could enter for free by mail, and it is of no moment that doing so might require a modicum of additional effort. *See California Gasoline Retailers v. Regal Petroleum Corp.*, 50 Cal. 2d 844, 862 (1958) (free entry upheld as legitimate even where "a ticket holder must go to the place of business of the sponsor of the scheme to deposit the ticket stub").

> 3.   *Plaintiffs fail to allege a causal nexus between the allegedly misleading disclosures and their supposed injury.*

As previously described, because Plaintiffs' CLRA, UCL (fraudulent prong) and FAL claims sound in fraud, they are subject to a heightened pleading standard whereby Plaintiffs must allege with particularity the "who, what, when, where, and how of the misconduct," "what is false or misleading about the purportedly fraudulent statement," "actual reliance on the allegedly deceptive or misleading statements," and that "the misrepresentation was an immediate cause of [their] injury-producing

conduct." *Davidson*, 889 F.3d at 964; *Weisberg v. Takeda Pharm. Co. Ltd.*, No. CV 18-784 PA (JCX), 2018 WL 6219879, at *4 (C.D. Cal. May 7, 2018); *see also Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1556 (2011) ("[P]laintiffs in a CLRA action [must] show not only that a defendant's conduct was deceptive but that the deception caused them harm.").

Here, Plaintiffs' actual allegations in Paragraphs 104-138 of the Complaint are entirely conclusory and—in addition to the fact that Plaintiffs do not even allege to have been exposed to the same disclosures as set out in the manufactured allegations within Paragraphs 26-103—fail to allege any causal nexus between the alleged misrepresentations and their injury with any particularity at all.

By way of example, Plaintiffs allege that they "would not have purchased the Omaze sweepstakes entries, or would have purchased fewer of them, had Defendant not misrepresented the purchase as donations to the charities identified by Omaze." Compl. ¶ 122. Yet it cannot be determined from this conclusory allegation *how* Plaintiffs were misled by any particular statement, especially given the conspicuous disclosures described herein. It is also unreasonable to rely on an unfounded assumption that no part of a donation will be used to pay for fundraising expenses, *see Riley*, 487 U.S. at 804, as well as to assume that a fundraising initiative is fraudulent simply because some funds were retained by the fundraiser. *See id.* at 793 (observing that "there is no nexus between the percentage of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent"); *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 961, 104 S. Ct. 2839 (1984) ("[T]here is no necessary connection between fraud and high solicitation and administrative costs [because] [a] number of other factors may result in high costs").

Moreover, to the extent Plaintiffs premise their CLRA, UCL, and FAL claims on alleged omissions, they fail for two additional reasons. First, Plaintiffs "must allege facts either showing that the alleged omissions are 'contrary to a representation actually made by the defendant, or showing an omission of a fact the defendant was

obliged to disclose.'" *Andren v. Alere, Inc.,* 207 F. Supp. 3d 1133, 1141 (S.D. Cal. 2016). Plaintiffs only generally allege that Omaze made certain omissions and do not plead any specific facts to meet this standard. Second, Plaintiffs' allegations as to questions of law, such as the operation of an "illegal lottery," while untrue, cannot form the basis for a fraud claim because this involves a question of law, not fact. *See Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 621 (9th Cir. 2004) ("It is . . . well settled, as a general rule, that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law.") (internal citation omitted).

Plaintiffs' vague allegations do not meet the pleading standard for CLRA, UCL and FAL claims and thus should be dismissed.

> **4.** *Plaintiffs cannot show any unlawful conduct because Omaze's fundraising model is a legal promotional sweepstakes, not an "illegal lottery," and complies with all disclosure requirements.*

Finally, to the extent that Plaintiffs' claims under the CLRA or the UCL's "unlawful" prong[6] allege that Omaze's sweepstakes are illegal lotteries, or that Omaze fails to comply with state-law disclosure requirements, the facts and law belie their assertion for several separate and independent reasons.

*First,* Omaze's sweepstakes are not lotteries because they do not require consideration. Under California law, a lottery is defined as "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property." Cal. Pen. Code § 319. Where a winner is selected through drawing of tickets or entries, entries must be provided through a "general and indiscriminate" distribution, which means that while entries may be distributed in response to paid

---

[6] Notably, while the UCL may offer limited remedies to a private plaintiff allegedly harmed by an "unlawful" act, there is no private right of action under the criminal statutes identified by Plaintiffs here and no right under the CLRA—with its more expansive remedies—to base a cause of action on alleged criminal law violations. *See* Cal. Civ. Code § 1780(a) (limiting scope of CLRA's private right of action to the list of acts specifically enunciated in Section 1770).

1  activity, no purchase may be ***required*** to obtain entries.  *Regal*, 50 Cal. 2d at 856-858.

2  Here, Omaze offers free entry to every single participant on equal terms, which

3  ensures that the consideration element required for a lottery is not met.

4       While acknowledging that an individual may enter for free, Plaintiffs attempt to

5  manufacture the element of consideration by asserting that Omaze "requires

6  consideration from consumers as a group."  Compl. ¶ 73.  This novel theory of "group

7  consideration" has no basis in the law and Plaintiffs cite ***no case*** in which anything

8  resembling such a theory has been applied to find that a game should be considered

9  an illegal lottery.  Indeed, the *Regal* Court rejected a similar argument "that patronage

10  from the ticket holders as a whole constituted consideration for the distribution of the

11  prize even though the individual holders of tickets had not parted with consideration

12  for the individual ticket held by them."  *Regal*, 50 Cal. 2d at 854.  "Since it clearly

13  appears from the record that any person could have received a ticket, or tickets, free

14  for the asking, or even without a request and without any necessity of making any

15  kind of purchase it would seem that the relative numbers of tickets distributed with

16  purchases or without purchases should not be determinative of the issue involved

17  which is whether the holder, or holders, of the tickets paid, or promised to pay a

18  valuable consideration for the chance of winning a prize."  *Id.* at 858.[7]

19       Instead, Plaintiffs simply misinterpret *People v. Shira*, 62 Cal. App. 3d 442

20  (1976) to require something more than offering each participant the opportunity to

21  enter for free, and providing an equal chance for paid and free entries to be selected in

22  a prize drawing (as Omaze does).  Compl. ¶ 71.  *Shira* involved a game of skill and

23  chance in which a participant would receive one free opportunity to throw a ring over

24  a peg and would receive free bingo cards if she was successful.  62 Cal. App. 3d at

25  446-50.  If not, she could purchase two bingo cards with the chance to be reimbursed

26  ---

[7] In fact, those who made purchases in *Regal* often received ***more*** tickets than those

27  who did not, and the Court still found that the element of consideration was lacking.

*Id.* at 857-58.  *A fortiori*, where a user can obtain free entries up to the entry limit

28  under Omaze's sweepstakes, the element of consideration is clearly lacking.

if she succeeded in a follow-up ring toss.  *Id.*  The court found that this scheme

required consideration because there was some subset of participants—those who did

not succeed in either ring toss—who could not enter for free.  *Id.*

Thus, all that *Shira* requires by a "general and indiscriminate distribution of

tickets" is that all entrants be given an equal opportunity to enter the game for free,

which is exactly what Omaze provides.  Omaze makes free entries available to all

users up to the same entry limit for entries obtained through donations.  *E.g.*, Segal

Decl., Ex. 9 at ¶ 1 (providing instructions to "enter without a donation" and stating

"[e]nter as often as you wish, but each entry must be mailed separately"), Ex. 2 at ¶ 2

("Individuals may submit the '*Alternative Method of Entry*' form as many times as

desired," up to the entry limit).  Nowhere do Plaintiffs make any allegation that they

were denied free entry for participation in the sweepstakes or denied the opportunity

to win because of the absence of a donation.  Nor do Plaintiffs identify any subset of

individuals who are prohibited from entering for free.  Rather, they seek return of

every donation they ever made to charity based solely on a novel and unsupported

"group consideration" theory where the only applicable authority supports Omaze's

position.  The Court should thus decline Plaintiffs' request.

*Second,* contrary to Plaintiffs' allegations, Omaze's sweepstakes are indeed "a

form of commercial promotion."  Compl. ¶ 69.  Plaintiffs' own comparison solidifies

the point.  They argue that the quintessential example of a promotional sweepstakes is

where McDonald's promotes sale of its food and drink items by providing customers

with entries as a thank-you for purchasing.  *Id.*  Yet Omaze, a commercial charitable

fundraiser, does the same thing.  Omaze uses sweepstakes to promote charitable

donations and provides participants with entries as a thank-you for donating.  This

fundraising model does not automatically convert Omaze's offering into an "illegal

lottery" simply because the object of the promotion is less tangible than a hamburger

or soda (not to mention a great deal more socially desirable).  Further, *Shira* is again

inapposite; there it was held that "[t]he payment of 25 cents in RINGO in exchange

for a small white ring and two 'Bingo' cards is not a purchase as such because the player is not entitled to keep the ring or the cards. It is a wager." 62 Cal. App. 3d at 458. Here, by contrast, an Omaze donor *does* get to keep the concomitant benefits of his or her donation (the satisfaction of donating to charity, a tax write-off, etc.).

*Third,* Plaintiffs have not identified any state-law disclosure requirements that are actually applicable to Omaze and which Omaze violates:

- Cal. Bus. Prof. Code § 17537.1: This statute concerns individuals or entities offering "as part of an advertising plan or program . . . any incentive as an inducement to the recipient to visit a location, attend a sales presentation, or contact a sales agent in person." The obvious applicability is to potentially-misleading timeshare presentations or similar. Despite Plaintiffs' specious efforts to twist the language of the statute, it clearly does not apply to Omaze, which has offered no incentive to induce anyone to visit any location, attend a sales presentation, or contact a sales agent. Compl. ¶¶ 92-94.

- Cal. Bus. Prof. Code § 17539.1(a)(1), (4): These statutes expressly apply only to a "contest." Compl. ¶ 97. A "contest" is a game of "skill or any combination of chance and skill and which is, or in whole or part may be, conditioned upon the payment of consideration." *Freeman,* 68 F.3d 285 at 290. They do not apply to games of pure chance like sweepstakes. *Id.* Nor would it make any sense to apply them to sweepstakes because they require disclosures like, for example, "the percentage of contestants correctly solving each puzzle" and there are no puzzles to solve in a sweepstakes. Compl. ¶ 97.

- Cal. Bus. Prof. Code § 17539.1(a)(3): This statute forbids the operator of a "contest or sweepstakes" from misrepresenting the odds of winning, but Plaintiffs make no allegation that Omaze has done so. Compl. ¶ 96. Indeed, their own Complaint evidences that Omaze simply states: "Odds of winning depend on the number of entries held." *Id.* ¶ 99, Ex. A.

- Cal. Bus. Prof. Code § 17539.1(a)(7): This statute forbids the operator of a "contest or sweepstakes" from failing to award and distribute the prize as advertised, but Plaintiffs make no allegation that Omaze has ever refused to award a prize to the winner of a sweepstakes. Compl. ¶ 96.

- Cal. Bus. Prof. Code § 17539.15(j): This statute requires the operator of a sweepstakes to disclose "the date or dates the final winner or winners will be determined." Compl. ¶ 96. Again, Plaintiffs' own Complaint shows that Omaze does so. *Id.*, Ex. A (winner to be determined "[w]ithin 10 business days of campaign close" and announced "on or around October 14, 2020").

- Cal. Bus. Prof. Code § 17539.5(e): This statute provides: "If the odds depend upon the number of entries received and the number of persons solicited is not

controlled by the sponsor of the sweepstakes, a statement to the effect that the odds depend on the number of entries received shall be sufficient." Compl. ¶ 96. Omaze provides that very disclosure (*id.* ¶ 99, Ex. A), and it may do so because it does not control the number of persons to whom entries are offered. While Omaze places ads on certain platforms, it does not know exactly how many people will view those ads, much less enter. Further, anyone can enter at any time through Omaze's website.

Given all of the foregoing, there are no "unlawful" acts upon which Plaintiffs may predicate their causes of action, rendering them subject to dismissal.

## B. Plaintiffs' Fraud Claim Fails for the Same Reasons as Their Fraud-Based Consumer Protection Claims

To assert a claim of common law fraud under California law, the plaintiff must plausibly plead "(1) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage." *Bower*, 196 Cal. App. 4th at 1557. "It is essential that the person complaining of fraud actually . . . relied on the alleged fraud, and suffered damages as a result." *Id.* (ellipsis in original).

Similar to their CLRA, UCL, and FAL claims, however, Plaintiffs assert no more than generalized allegations that Omaze's use of the word "donate" led them to believe that all or the majority of their donations would go to charity, or that Omaze deceived them into thinking they would be more likely to win if they donated money. Compl. ¶ 171. Because a fraud claim requires evidence of a misrepresentation and justifiable reliance, Plaintiffs cannot succeed where a reasonable consumer would not have been deceived by the disclosure. *See* Parts IV.A.1, IV.A.2, *supra*. Plaintiffs also must plead with particularity how the alleged misrepresentations caused their reliance and injury, which they still fail to do. *See* Part IV.A.3, *supra*.

Plaintiffs' fraud claim also carries the additional element of scienter. Plaintiffs do not plead in their Complaint how Omaze's alleged misrepresentations were intended to harm or made with knowledge of their falsity, other than with bald and conclusory language that Omaze "intended to induce Plaintiffs and those similarly

1  situated to alter their position to their detriment."  Compl. ¶ 174.  The claim is

2  therefore subject to dismissal for this reason as well.

3        **C.      Plaintiffs' Unjust Enrichment Claim Lacks a Cognizable Basis**

4        California does not recognize a claim for "unjust enrichment."  *Quiby Inc. v.*

5  *Posey*, No. 17-CV-03847-EMC, 2018 WL 732493, at *4 (N.D. Cal. Feb. 6, 2018).

6  Even if recast as a claim for restitution under a quasi-contract theory, however,

7  Plaintiffs cannot dispute that they received the benefit of their bargain with Omaze.

8  They allege to have donated money to charity and received entries into a sweepstakes

9  in return.  Whether they won the drawing, should have had a better chance of winning

10  the drawing, or would have entered for free if they had only known some supposed

11  version of the facts is irrelevant to a claim for quasi-contract.  So long as Omaze

12  entered Plaintiffs in the sweepstakes drawing as promised—which Plaintiffs do not

13  and cannot dispute—unjust enrichment is not a plausible theory to advance claims

14  that they were somehow misled into entering in the first instance.  *See Peterson v.*

15  *Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008) ("There is no equitable reason for

16  invoking restitution when the plaintiff gets the exchange which he expected.");

17  *Derbaremdiker*, 2012 WL 4482057, at *8 (sweepstakes entrant "received exactly

18  what was represented to him," *i.e.*, a chance to win).

19        **D.      Plaintiffs' Claims All Fail Because Plaintiffs Lack Standing to Sue
              for Alleged Injuries to the Designated Charities**

20        In addition to the foregoing, ***all*** of Plaintiffs' claims also fail because their own

21  admissions evidence that they lack standing to assert them.  To establish standing

22  under the UCL and FAL, a plaintiff must "(1) establish a loss or deprivation of money

23  or property sufficient to qualify as injury in fact, i.e., economic injury; and (2) show

24  that economic injury was the result of, i.e., caused by, the unfair business practice or

25  false advertising that is the gravamen of the claim."  *In re Sony Gaming Networks*,

26  903 F. Supp. 2d 942, 965 (S.D. Cal. 2012) (internal citation omitted).  "Similarly, the

27  CLRA requires that a plaintiff allege a 'tangible increased cost or burden to the

28

1  consumer.'" *Id.* (internal citation omitted).  A fraud theory requires "that the person

2  complaining of fraud actually . . . relied on the alleged fraud, and suffered damages as

3  a result." *Bower*, 196 Cal. App. 4th at 1557.  And to recover restitution under a quasi-

4  contract theory, the plaintiff must confer a benefit on the defendant.  *See Ouiby*, 2018

5  WL 732493, at *4 ("Ms. Posey lacks standing to assert a claim for relief to the extent

6  that Kickfurther was enriched as a result of money being provided to it by someone

7  other than Ms. Posey herself.").

8       To the extent that Plaintiffs claim to have been deceived into believing that "all,

9  or the overwhelming majority" of their donations would go to charity, they tacitly

10  concede that they lack any cognizable injury or "increased cost" resulting from their

11  donation(s).  Ms. Carlin alleges she "liked the fact that the money she was paying

12  would go to charity, and donated based on the representation that the money would go

13  to charity." *E.g.*, Compl. ¶ 133.  She then states that she was "interested in

14  participating in Omaze's sweepstakes for free, but was unable to do so easily," and

15  "[c]ombined with the belief that money she paid would go to charity, this led her to

16  purchase sweepstakes entries she would not have purchased if she could have

17  submitted multiple free entries at once." *Id.* ¶ 137.  Mr. Juranek and Mr. Knüttel

18  make similar contentions. *Id.* ¶¶ 113, 120, 125.

19       Were it not for Omaze's alleged misrepresentations, in other words, Plaintiffs

20  allege that they would have donated directly to charity and then entered Omaze's

21  sweepstakes for free to achieve the same result, depriving Omaze of any portion of

22  their donation. *See* Compl. ¶¶ 11 (alleging that if not for Omaze's alleged conduct,

23  "almost everyone would enter for free and Omaze's business would collapse"), 49

24  ("Reasonable consumers believe that they are donating to the particular charities . . .

25  not paying the bulk of their money to Omaze").  Regardless of which option Plaintiffs

26  took, however, Plaintiffs would still be in the exact same position.  It is the ***charities***

27  that may supposedly have received a greater part of Plaintiffs' donations if Plaintiffs

28  donated directly.  Plaintiffs lack standing to assert the charities' supposed injuries.

### E.    Plaintiffs' Claims All Fail Because the Remedies They Seek Unconstitutionally Infringe on Omaze's First Amendment Rights

Plaintiffs seek to impose civil liability on Omaze for allegedly not disclosing the manner in which each donation was allocated to the designated charity or to the payment of fees and expenses (even though Omaze did disclose that allocation on multiple occasions).  Compl. ¶¶ 154, 166, 176.  Plaintiffs also seek equitable relief on these grounds, including an injunction "mandat[ing] that Defendant. . . conspicuously and adequately inform consumers how much of each payment goes to Omaze and how much goes to each identified charity."  Compl. ¶¶ 153, 168, 188, 192.

However, U.S. Supreme Court precedent has long provided that "[t]he solicitation of charitable contributions is protected speech." *Riley*, 487 U.S. at 789. In *Riley*, the Supreme Court reviewed a North Carolina statute that, among other things, required professional charitable fundraisers to disclose in solicitations to potential donors the percentage of contributions that were actually disbursed to the charity. *Id.* at 782.  The Court determined the provision was subject to strict scrutiny as a content-based restriction on freedom of speech, and struck it down because it was not narrowly tailored to the identified goal of deterring fraud. *Id.* at 784.  Instead, the Court observed that such disclosures might actually cause certain fundraisers to "cease engaging in certain types of fundraising (such as solicitations combined with the advocacy and dissemination of information) or representing certain charities (primarily small or unpopular ones)." *Id.* at 794.

Plaintiffs essentially ask this Court to impose liability on Omaze based on the same disclosure requirement the Supreme Court held was unconstitutional in *Riley*— to disclose in solicitations to potential donors the percentage of funds raised that were used for charitable purposes—and indeed to force Omaze to do so in some nebulously more-precise fashion.  Plaintiffs attempt to justify these remedies by arguing that Omaze's alleged omission(s) deceive donors into believing that most if not all of their donations go to the designated charity.  Compl. ¶¶ 48-49.  But in *Riley*, the state offered the same grounds to justify the restrictions that it imposed by statute. *See*

*Riley*, 487 U.S. at 799 (state asserted "the importance of informing donors how the money they contribute is spent in order to dispel the alleged misperception that the money they give to professional fundraisers goes in greater-than-actual proportion to benefit charity").  The Court's rebuttal is thus particularly instructive here:

> [T]here are several legitimate reasons why a charity might reject the State's overarching measure of a fundraising drive's legitimacy—the percentage of gross receipts remitted to the charity.  For example, a charity might choose a particular type of fundraising drive, or a particular solicitor, expecting to receive a large sum as measured by total dollars rather than the percentage of dollars remitted. Or, a solicitation may be designed to sacrifice short-term gains in order to achieve long-term, collateral, or noncash benefits. . . .
>
> Although we do not wish to denigrate the State's interest in full disclosure, the danger the State posits is not as great as might initially appear. . . . the State presumes that the charity derives no benefit from funds collected but not turned over to it. Yet this is not necessarily so.

*Id.* at 792, 798.

These are the same benefits that Omaze, a professional charitable fundraiser, provides for CAF America and the designated grantees.  *See, e.g.,* Segal Decl., Ex. 10 ("A smaller percentage of a larger amount is more impactful than a bigger percentage of a smaller amount.").  While Plaintiffs allege that the percentage of donations conferred to the designated charities has dropped over the years Omaze has operated, Plaintiffs concede that the total dollar amount that went to charity has ***substantially*** increased year-over-year, from $463,000 in 2015 to $22 million in 2019.  Compl. ¶ 48.[8]  As sweepstakes have gotten bigger and prizes more expensive, the costs to run them have gone up, but there is no denying that the net benefit to charity has increased and Plaintiffs cannot stand in the charities' shoes to dictate how they should elect to raise money.  There are likewise non-monetary benefits to the charities involved, including visibility and exposure.  *Riley*, 487 U.S. at 792, 798.

---

[8] It is ironic that Plaintiffs include these figures in their Complaint after alleging they were somehow prevented from discovering them.  The figures come from Omaze's publicly-available state reporting, which Plaintiffs could have accessed at any time.

1       Thus, in accordance with the Supreme Court's decision in *Riley*, Plaintiffs'

2   claims all fail to the extent they rely on an interpretation of California law that would

3   impose civil liability or equitable remedies outside constitutional bounds.

4       **F.    Plaintiffs' Complaint Improperly Rests on Conduct Outside of the Applicable Limitations Period**

5       Finally, in the event that Plaintiffs' claims are not fully dismissed pursuant to

6   the foregoing, the Court should nevertheless dismiss any claims concerning Omaze's

7   practices outside the statute of limitations.  Plaintiffs' claims under the UCL and FAL

8   are governed by a four-year statute of limitations.  Cal. Bus. Prof. Code § 17208;

9   *Canales v. Fed. Home Loan Mortg. Corp*., Case No. CV 11–2819, 2011 WL

10  3320478, at *7 (C.D. Cal. Aug. 1, 2011).  Plaintiffs' claims under the CLRA, for

11  common law fraud, and for unjust enrichment are governed by a three-year statute of

12  limitations.  Cal. Civ. Proc. Code § 338(d); Cal. Civ. Code § 1783.  The longest

13  limitations period on any of Plaintiffs' claims is thus four years, which began

14  accruing when Plaintiffs entered a sweepstakes.  *Harshbarger v. Philip Morris, Inc.*,

15  No. 02–05267, 2003 WL 23342396, at *5 (N.D. Cal. Apr. 1, 2003) (action accrues

16  when wrongful act is done, or when wrongful result occurs, whichever is later).

17      Consequently, any events occurring prior to April 15, 2017 are outside any

18  relevant statute of limitations.  Yet the acts alleged in Plaintiffs' Complaint span more

19  than a decade, all the way back to *2009*.  None of the named Plaintiffs even contend

20  to have entered Omaze sweepstakes in this timeframe, as the earliest entry alleged

21  was in 2015.  Compl. ¶ 115.  The clear goal of this strategy is to allow Plaintiffs'

22  counsel to fling mud at Omaze before discussing Plaintiffs' actual allegations within

23  the limitations period (which are bald and conclusory in comparison to said mud-

24  slinging).  The Court should therefore dismiss Plaintiffs' claims predicated upon any

25  conduct occurring prior to April 15, 2017 (*see, e.g.*, Compl. ¶¶ 33-36, 41-47).

26  Alternatively, Omaze respectfully requests that such allegations be stricken pursuant

27  to Fed. R. Civ. P. 12(f).

28

1    **V.    <u>CONCLUSION</u>**

2          For the foregoing reasons, the Court should grant this Motion and dismiss

3    Plaintiffs' Complaint with prejudice.

4

5    Dated:  June 14, 2021                    WARGO & FRENCH LLP

6                                             By:    */s Jeff Williams*
                                                     JEFFREY N. WILLIAMS
7                                             Attorneys for Defendant Omaze, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28