1

**GUTRIDE SAFIER LLP**

2
SETH A. SAFIER (State Bar No. 197427)
ANTHONY PATEK (State Bar No. 228964)

3
100 Pine Street, Suite 1250
San Francisco, CA 94111

4
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

5

6
Attorneys for Plaintiffs

7
UNITED STATES DISTRICT COURT

8
NORTHERN DISTRICT OF CALIFORNIA

9

10
ANDREAS KNÜTTEL, MATTHEW
JURANEK, AND ADRIANA CARLIN as

11
individuals, on behalf of themselves, the
general public and those similarly situated,

12
    Plaintiffs,

13

14
        v.

15
OMAZE, INC., a Delaware Corporation

16
    Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 4:21-cv-02726 (JST)

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

Date:  August 12, 2021
Time: 2:00 p.m.
Judge: Hon. Jon S. Tigar
Ctrm.:  6

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................................... 1

II.    Background ................................................................................................................... 2

    A.   Private Lotteries are Illegal In California ............................................................... 3

    B.   Sweepstakes, While Legal, Are a Highly Regulated Form of Gambling ........................... 3

    C.   Omaze Began as an Online Lottery that Works "Just Like a Raffle" .................................. 4

    D.   In 2013, Omaze Falsely Recharacterized Its Lotteries as Sweepstakes ............................ 5

    E.   In 2018, Omaze Introduced For-Profit "Omaze Owned" Drawings of Luxury Items and Started Postponing Drawings Dates Beyond Those Advertised. .................................. 6

    G.   The Plaintiffs' Experiences ................................................................................... 8

III.    ARGUMENT ................................................................................................................. 9

    A.   Legal Standard ....................................................................................................... 9

    B.   The Complaint Properly Alleges Violations of California's UCL. ................................... 10

        1.   UCL Unlawful Prong. ..................................................................................... 10

           a.   Omaze Violates Laws Forbidding Private Lotteries. ................................................. 11

           b.   Omaze Fails to Provide Disclosures Required by Law. ............................................... 12

           c.   Omaze Violates Anti-Fraud Provisions of California Sweepstakes Laws. .................. 13

        2.   UCL Unfairness Prong. .................................................................................... 15

        3.   UCL Fraud Prong. ........................................................................................... 15

    C.   The Complaint Properly Alleges Violations of California's CLRA. ................................. 19

    D.   The Complaint Properly Alleges Violations of California's FAL. ................................... 20

    E.   The Complaint Properly Alleges an Omissions Claim ................................................. 20

    F.   The Complaint Properly Alleges Unjust Enrichment ................................................... 21

    G.   Plaintiffs Have Standing ...................................................................................... 21

    H.   The Complaint Does Not Present First Amendment Concerns ...................................... 22

    I.   Facts Pre-Dating the Claims Do Not Violate the Statute of Limitations .......................... 23

    J.   If Necessary, the Court Should Grant Leave to Amend ............................................... 24

IV.    CONCLUSION ........................................................................................................... 24

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 9

*Astiana v. Hain Celestial Grp., Inc.,* 783 F.3d 753, 762-63 (9th Cir. 2015) ................................. 21

*California Gasoline Retailers v. Regal Petroleum Corp.* ("*Regal*"), 50 Cal. 2d 844, 862 (1958)  11

*City of L.A. v. Citigroup Inc.*, 24 F. Supp. 3d 940, 951 (C.D. Cal. 2014)...................................... 24

*Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197 (1983).......... 16

Consumer Legal Remedies Act, Cal. Civil Code §§ 1770 et seq. ................................................. 19

*Davidson v. Kimberly-Clark Corp.*, 873 F.3d 1103, 1115 (9th Cir. 2017) .................................... 22

*Derbaremdiker v. Applebee's*, No. 12-CV-01058 KAM, 2012 WL 4482057 (E.D.N.Y. Sept. 26, 2012)............................................................................................................................... 21

*Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247 (2010)...................................... 15

*Freeman v. Time, Inc.*, 68 F. 3d 285, 289 (9th Cir. 1995) ........................................................... 18

*Goldman v. Bayer AG*, No. 17-cv-0647-PJH, 2017 U.S. Dist. LEXIS 117117, at *23 (N.D. Cal. July 26, 2017)..................................................................................................................... 21

*Haskell v Time, Inc. ("Haskell I")*, 857 F. Supp. 1392, 1403 (E.D. Cal. 1994)............................ 18

*Haskell v. Time, Inc. ("Haskell II")*, 965 F. Supp. 1398, 1404 (E.D. Cal. 1997)..................... 3, 11

*In re First All. Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006)............................................................ 10

*In re Sony Gaming Networks*, 903 F. Supp. 2d 942, 965 (S.D. Cal. 2012) .................................. 22

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009)........................................................... 16

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ........................................... 18

*Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293 (2012)........................................................ 10

*Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007) ........................................... 10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ...................................................... 22

*McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227 (Cal. Ct. App. 2006) ........................................ 15

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578 (3d Cir. 2002)................................................................................................................ 16

*People v. Shira*, 62 Cal. App. 3d 442, 458 (1976) ............................................................... 3, 11, 12

*Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008).................................................. 21

*Riley v. Nat'l Fed. Of the Blind of North Carolina*, 487 U.S. 781, 799, 108 S. Ct. 2667 (1988) . 18, 22, 23

*Rovai v. Select Portfolio Servicing*, LLC, No. 14-cv-1738-BAS-WVG, 2018 U.S. Dist. LEXIS 107764 (S.D. Cal. June 27, 2018) ................................................................................. 15

*Sanders v. Choice Mfg. Co.*, No. 11-3725 SC, 2011 U.S. Dist. LEXIS 137365  (N.D. Cal. Nov. 30, 2011) ................................................................................................................................ 16

*SEC v. Sabhlok*, No. C 08-04238 CRB, 2009 U.S. Dist. LEXIS 138804, at *29 (N.D. Cal. Feb. 18, 2009) ............................................................................................................................... 23

*Siino v. Foresters Life Ins. & Annuity Co.*, 2020 U.S. Dist. LEXIS 178709 (N.D. Cal. Sep. 1, 2020) ...................................................................................................................................... 10

*State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093 (1996) ...................... 15, 16

*United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984 (9th Cir. 2011) ................................. 9

*William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255 (9th Cir. 1995) ........................................... 16

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008) .................................................... 16

*Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008) ................................................. 18


Statutes

§ 17539.1(a)(7) .......................................................................................................................... 13

Bus. Prof. Code § 17539.1(a)(4) ............................................................................................... 14

Cal. Bus. & Prof. Code § 17200 ................................................................................................ 10

Cal. Bus. Prof. Code § 17539 ............................................................................................ passim

Cal. Bus. Prof. Code § 17539.1(a)(3) ............................................................................ 4, 14, 15

Cal. Bus. Prof. Code § 17539.15 ....................................................................................... passim

Cal. Penal Code § 319 .................................................................................................................. 3

Cal. Penal Code § 320.5 .................................................................................................. 3, 10, 11

Cal. Penal Code 320 ..................................................................................................................... 3

False Advertising Law,  Bus. & Prof. Code §§ 17500, et seq. ................................................... 20

Penal Code § 320.5(m) ......................................................................................................... 3, 10

1    Plaintiffs Andreas Knüttle, Matthew Juranek, and Adriana Carlin ("Plaintiffs"), by and

2   through their counsel, respectfully submit this Opposition to Defendant Omaze, Inc.'s Motion to

3   Dismiss. (Dkt.# 16.)

4   **I.      INTRODUCTION**

5    The Court should deny Omaze's Motion to Dismiss.  The Complaint plausibly alleges that

6   Omaze engages in unlawful, unfair, and fraudulent behavior by: (1) operating a for-profit, private

7   lottery under the guise of a sweepstakes, (2) violating laws governing sweepstakes by not

8   honoring published dates for drawings and failing to publish estimated odds of winning, and

9   (3) misrepresenting the purchase of "entries" as charitable "donations," even though only about

10   15% of the money "donated" goes to charity.  These allegations support Plaintiffs' claims under

11   the unlawful, unfair, and fraud prongs of the UCL, as well as for violations of the Consumer

12   Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), common law

13   fraud/misrepresentation, and unjust enrichment.

14    Plaintiffs Knüttel and Juranek specifically allege that, because Omaze had not sold enough

15   "entries" to pay for the prizes in the "sweepstakes" in which they participated, Omaze postponed

16   the drawing dates. In so doing, Omaze demonstrated that it ***required*** a sufficient number of

17   people to pay to participate, thus establishing itself as an illegal private lottery under California

18   law. Omaze incorrectly argues that it is not operating a lottery because it allows a few people to

19   enter its drawings for free. But giving away a few free tickets does not convert a lottery into a

20   sweepstakes, and Omaze's failure to award prizes until it has made a profit presents a novel fact

21   that distinguishes this case from any of the precedent on which Omaze's motion relies.  Besides,

22   even if Omaze's *current* free entry method complies with the law in terms of visibility and ease,

23   that does not establish that its methods prior to 2020 did. Further, the Complaint identified

24   numerous ways in which Omaze discriminates between requests to participate based on money—

25   visibility and ease of entry are only one aspect of those claims.

26    Omaze's conduct also resulted in arbitrarily changing not only the rules and conditions of

27   the drawing, but the odds of winning, which additionally violates California's consumer

28   protection laws (e.g., falsely advertising the drawing dates and rules).  Ignoring the actual

allegations, Omaze says merely that it published drawing dates and *eventually* awarded the prizes. But under both California's lottery laws and false advertising laws, Omaze must perform its drawings on the dates that it advertises. Since Omaze's motion does not even address this allegation, it necessarily fails.

Omaze's other arguments are similarly ineffective and unpersuasive. While Omaze repeatedly asserts that factual allegations in the Complaint are false, Omaze's denial of those allegations is not sufficient to support dismissal on the pleadings. Omaze's extensive analysis of its contribution disclosures only underscores how fact-intensive that inquiry is, which makes it unsuitable for resolution on the pleadings. Its argument that consumers are not harmed when they are conned out of money they would have donated anyway—and therefore lack standing—is specious. Omaze's First Amendment argument is simply off-point, as this case does not involve a statute that places a prior restraint on Omaze's speech. Finally, Omaze's statute of limitations argument simply misunderstands the Complaint, which provides a history of Omaze's conduct for context, not claims based on activity in the distant past.

Accordingly, the Court should deny Omaze's motion to dismiss. Omaze's self-serving assertions that it does not violate the law or deceive consumers are not sufficient to support dismissal. Plaintiffs have provided a detailed Complaint that lays out numerous deceptive and unlawful aspects of Omaze's conduct, satisfying Federal Rules of Civil Procedure 9 and 12. Alternatively, if the Court finds that further detail is necessary, leave to amend should be granted.

## II.    BACKGROUND

Much of Omaze's motion rests on the canard that Plaintiffs are attempting to recover donations they made to charity. But Plaintiffs are not suing the charities to which Omaze passed money; they are suing Omaze. And Omaze is not a charity; it is a venture-capital-backed gambling enterprise. It sells lottery tickets, spends a large proportion of "donations" on luxury prizes, pockets at least half of the profits, and then gives the remainder (about 15% of gross receipts for "Omaze owned" campaigns) to charity. None of the money Plaintiffs seek to recover will come from charity. To the contrary, one of Plaintiffs' goals is to increase the amount of money donated to charity by preventing Omaze's deceptive practice of passing off its for-profit

lottery as a form of charity raffle or sweepstakes, as described below.

**A.      Private Lotteries are Illegal In California**

Lotteries are a form of gambling, and thus regulated closely under California law. A lottery is defined as "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." Cal. Penal Code § 319.

Only the state is allowed to conduct lotteries; private lotteries are generally illegal. Cal. Penal Code 320. Raffles are the sole exception, and they are subject to numerous requirements, including that at least 90% of gross receipts go to charity. *See* Cal. Penal Code § 320.5. It is illegal to conduct raffles over the internet. *Id*.

**B.      Sweepstakes, While Legal, Are a Highly Regulated Form of Gambling**

Under California law, a "sweepstakes" is "a procedure, activity, or event, for the distribution, donation, or sale of anything of value by lot, chance, predetermined selection, or random selection that is not unlawful under other provisions of law." Cal. Bus. Prof. Code § 17539. Sweepstakes developed as a form of commercial promotion. *See People v. Shira*, 62 Cal. App. 3d 442, 458 (1976). Legally, sweepstakes differ from lotteries in that they do not require entrants to provide consideration to participate, and there must be a "general and indiscriminate dissemination of free tickets." *People v. Shira*, 62 Cal. App. 3d 442, 458 (1976); Cal. Bus. Prof. Code § 17539.15(b)-(d), (l)(1); *cf. Haskell v. Time, Inc. ("Haskell II")*, 965 F. Supp. 1398, 1404 (E.D. Cal. 1997) (holding consideration absent where "[n]o one is *ever* required to purchase a chance to win") (emphasis added).

Penal Code § 320.5(m) identifies sweepstakes as an exemption to raffle regulations, but only if no one is required to pay for entry. Specifically, Penal Code § 320.5(m) exempts certain "raffles" from the 90% charitable use and disclosure requirements of raffles, but only if "(1) It involves a general and indiscriminate distribution of tickets. (2) The tickets are offered on the

same terms and conditions as the tickets for which donations are given. (3) *The scheme does not require any of the participants to pay for a chance to win*.") (emphasis added).

Solicitation materials for entry into sweepstakes must include a "clear and conspicuous" statement that no purchase is necessary. Cal. Bus. Prof. Code § 17539.15(b). Furthermore, "[s]weepstakes entries not accompanied by an order for products or services shall not be subjected to any disability or disadvantage in the winner selection process to which an entry accompanied by an order for products or services would not be subject." *Id.*, § 17539.15(c); see also § 17539.15(d) (forbidding solicitations that suggest such an advantage or disadvantage).

Additional requirements also apply to sweepstakes. "It is illegal to misrepresent in any manner the odds of winning any prize in a sweepstakes." Cal. Bus. Prof. Code § 17539.1(a)(3); see also *id.*, § 17539.1(a)(4) (same, for " the rules, terms, or conditions of participation in a contest"). Sweepstakes operators must publish the odds of winning each prize, and, if they control the number of entries solicited, the expected number of entries. *Id.*, § 17539.5. Further, the official rules must "disclose information about the date or dates the final winner or winners will be determined." *Id.*, § 17539.15(j).

### C.     Omaze Began as an Online Lottery that Works "Just Like a Raffle"

Omaze was founded in 2009. (ECF 1, ¶ 33.). At the time of its founding, it solicited donations in return for a chance to win a celebrity "experience" (e.g., working out with Dwayne "the Rock" Johnson) as part of various fund-raising campaigns. Omaze solicited consumers to purchase tickets through its web site, and through email solicitations. Either way, each prize drawing was part of a distinct campaign with its own web page. Every campaign was (and still is) advertised as benefiting a specific cause or charity. (*Id.*) Omaze's web site advertised "Donate to Win." (*Id.*) Omaze was explicit that "the more you donate, the better your chances of winning." (*Id.*) Its web site explicitly mimicked a raffle, selling "tickets." (*Id.*, ¶¶ 34.) In fact, Omaze's web page touted that its drawings worked "just like a raffle" where "the proceeds are delivered to benefit a specific social cause." (*Id.*, ¶¶ 5, 41, and 65.) Omaze did not disclose the percentage of donations it kept as fees, and there was no obvious means of free entry.

**D.    In 2013, Omaze Falsely Recharacterized Its Lotteries as Sweepstakes**

Around 2013—perhaps realizing it was running an illegal raffle—Omaze added a footnote to its web pages indicating that no purchase or contribution was necessary to win, thereby framing its drawings as sweepstakes. (*Id*., ¶ 35.)  Omaze also replaced references to "tickets"—a word associated with raffles—with the word "entries." (*Id*.) Although the word "entry" parallels the legal terminology of sweepstakes, Omaze uses the term "entry" to refer only to the instrument that embodies the participant's chance to win (i.e., a ticket or number that may be pulled when the drawing is conducted), whereas relevant cases and statutes use "entry" to refer to the entry-request received from participants. (*Id*. ¶ 83.) *Cf*. § 17539.5 (refering to the number of "entries" solicited); § 17539.15(c) (refering to "entry materials" received with or without orders for products, and mandating they be treated identically).

But unlike a sweepstakes sponsor, Omaze has never treated paying and non-paying entrants the same. (*Id*., ¶¶ 35-36, 67, and 76-90)  One difference is ease of participation.  In 2013, Omaze allowed people to purchase chances to win directly online, but those wishing to enter for free could only do so by mail. (*Id*., ¶ 35.) Finding the instructions to enter for free required clicking through multiple pages and reading large amounts of fine print, and were generally limited to a single chance to win with each mailed entry. (*Id*., ¶ 78.) By 2018, Omaze had made free entry available online, but only using a hyperlink placed below in fine print buried in the legal disclosures on each campaign page.  (*Id*., ¶ 79.)  It also added a hyperlink stating "enter without contributing" in small print below the much larger, more prominent "donate" buttons on each page.  (*Id*., ¶ 79 and Ex. A.)[1]

Even today, Omaze treats requests for entry differently based on whether they are accompanied with payment and how large that payment is.  (*Id*., ¶¶ 76-90.). This discriminatory pricing has, and continues, to include charging a different amount of money per drawing-entry (i.e., chance to win).  For example, since March 2018, donations up to $25 receive 10 "entries"

---

[1] This continued until January 2020, when the California Attorney General forced Omaze to include an "enter without contributing" button with the "donate" buttons on each campaign page, in the same size font as the "donate" buttons.  See https://oag.ca.gov/sites/all/ files/agweb/pdfs/charities/pdf/omaze-agreement.pdf (accessed July 6, 2021.)

per dollar (i.e., 10 chances to win per dollar spent), while purchases of over $50 receive "double entries" of 20 "entries" per dollar (i.e., 20 chances to win per dollar spent).  (*Id.*, ¶ 38.)  In contrast, people who submit requests to participate without payment (i.e., free entries) are currently assigned 2,000 "entries" (i.e., 2,000 chances to win). Historically, non-paying entrants have been given a number of "entries" comparable to a small donation, sometimes as low as a single chance to win.

The Complaint alleges that Omaze's lotteries violate the UCL and other asserted consumer protection laws by violating both law and public policy, and by misleading consumers into purchasing entries when they would not have if they knew they could enter for free. (*Id.*, ¶¶ 76-90; 151; 158; 160; 171; 180; 191.)

> **E.      In 2018, Omaze Introduced For-Profit "Omaze Owned" Drawings of Luxury Items and Started Postponing Drawings Dates Beyond Those Advertised.**

Prior to 2018, the prizes in Omaze's drawings were celebrity "experiences."  (*Id.*, ¶ 27.) Operating expenses associated with celebrity campaigns were generally low, since the celebrities were generally donating their time (e.g., by meeting with the winner) and any tangible items being offered as a prize (e.g., food, a stay at the celebrity's house, a signed ball, etc.). (*Id.*, ¶ 48.)

That changed in 2018, when Omaze introduced "Omaze owned" campaigns with luxury prizes, such as automobiles, homes, and vacations. (*Id.*)  Unlike the celebrity experiences, Omaze purchases the items it distributes in its Omaze-owned campaigns. This introduced substantial new operating costs, as many of the prizes Omaze distributes (e.g., Tesla automobiles valued at $134,000) are very expensive. (*Id.*, Ex. A.)

To fund this new business model, Omaze went to venture capital funds and obtained $30M in seed capital.  (*Id.* ¶ 13.). Since those funds have a duty to provide a return to their investors, Omaze is now presumably under an obligation to provide a return that justifies that $30M investment. (*Id.*). Omaze's transition to this for-profit model correlates with a precipitous

1  fall in the percent of gross receipts received by Omaze that go to charity, from 70% in 2015, to

2  50% in 2018, and 34% in 2019. (*Id.*, ¶ 48.)[2]

3       Afterward, Omaze started postponing drawings for some luxury prizes beyond the

4  published drawing dates.  (*Id.*, ¶ 73 &  Ex. B.) It appears that Omaze postpones these prize

5  drawings because it has not yet solicited enough purchases to cover the costs of the prizes in those

6  drawings. (*Id.*) The Complaint further alleges that this means Omaze is conducting an illegal

7  lottery, is marketing its drawings in violation of various laws governing sweepstakes, and is

8  engaged in false advertising and fraud to the extent it advertises that it fails to determine prize

9  winners on the dates and terms published on its web pages.

10       **F.       Omaze Characterized Purchases as Donations, While Hiding Costs and Fees**

11       Omaze uses the word "DONATE" prominently in solicitations on all of its campaign

12  pages.  At all times from its inception to the present, Omaze has used phrases such as "donate to

13  win" and "donations benefit a great cause" in large, prominent letters for each campaign. (*Id.*,

14  ¶ 33, 37-41, 45-46.)  The purchase button for "entries" are also labeled "donate," or appear near

15  that term. (*Id.*, ¶ 29; 37; 77; 80.)

16       Those same campaign pages hide Omaze's fees in fine print, often requiring one to scroll

17  through pages of material to find them. (*Id.*, ¶ 77.) Omaze's landing page—which is distinct from

18  the individual campaign pages and may not be viewed by people sent directly to a campaign page

19  by an ad or emails—has only intermittently included links to pages (or pop-up windows) that

20  disclose that Omaze subtracts its fees from donations. And those disclosure pages—which were

21  removed in 2018—never informed users that as little as 15% of donations go to the charitable

22  causes. Now, users must scroll though pages of legalese to find out what percentage of Omaze's

23  "donations" go to each cause.

24  _____

25  [2] Omaze obfuscates its for-profit lottery model by claiming that 100% of donations are paid to
charity (i.e., its putative client Charities Aid Foundation of America  ("CAFA")), and fees and

26  expenses are only deducted after all the money is donated. (ECF 16 at 6.) But Omaze's assertion
contradicts the Complaint, and the allegations of the Complaint control.  More importantly, even

27  if true, it does not change the outcome.  It does not matter whether Omaze's fees and expenses are
deducted before or after it gives the money to CAFA; either way, the lion's share goes to Omaze

28  and its operating costs, and little goes to charity.

Despite its fee being twice that allowed by law for raffles—and despite the fact that raffles do not allow free entry—Omaze continued to advertise that its drawings worked "just like a raffle." (*Id.*, ¶ 42.).  The Complaint alleges that this conduct is false and/or misleading, since the prominent use of "donate" in the context of a prize drawing is likely to lead consumers to believe that they are participating in a charity raffle, where the overwhelming majority of ticket receipts (≥90%) go to charity.

### G.     The Plaintiffs' Experiences

The Complaint alleges that each of the Plaintiffs purchased entries into Omaze's lotteries based on Omaze's representations above.

At least as early as 2017, Andreas Knüttel visited Omaze's web site and purchased chances to win a Tesla 3 automobile and other prizes. (*Id.*, ¶¶ 104-114.) Mr. Knüttel did so in reliance on Omaze's terms and conditions for that campaign, which represented that Omaze would perform the drawings on a specific date.  (*Id.*, ¶ 106.) He was later informed, without explanation, that Omaze would postpone the drawing. (*Id.*) He also believed, based on Omaze's representations that larger donations received more "entries," i.e., that he would have a better chance of winning if he spent more money. (*Id.*, ¶¶ 112-113.)  He did not see any indication that he could enter for free, nor any indication that a free entry would actually have obtained a higher overall chance of winning (2,000 chances to win) than his paid entry request (which should have gotten 500 chances to win). (Id., ¶¶ 112-13 &) He spent $50 entering several of Omaze's drawings, ultimately spending hundreds of dollars.  (*Id.*, ¶¶ 110-111.) Mr. Knüttel alleges that he would not have purchased Omaze's sweepstakes entries, or would have purchased fewer, if he had been aware that Omaze's representations above were false.

Matthew Juranek "donated" to several Omaze campaigns starting in 2015, including drawings for a Star Wars premiere and a Tesla 3. (*Id.*, ¶ 115-126.) In each instance, Mr. Juranek saw the campaign page, which listed terms and conditions for the drawing, including its date, and prominently advertised the lottery purchases as donations. (*Id.*) Mr. Juranek donated in amounts ranging from $25-$50, with total donations of hundreds of dollars. (*Id.*) He was also interested in submitting free entries, but was unable to do so easily. (*Id.*) Mr. Juranek was unaware that people

who entered for free could actually receive more chances to win (about 2,000) than he would with his $25 donations (which gave about 250 chances to win). (*Id*.) He was also unaware that Omaze would deduct substantial fees and costs from his "donation," resulting in as little as 15% going to the charities. (*Id*.) Mr. Juranek later learned that at least one prize drawing, for the Tesla 3, would be postponed, thereby changing the dates, terms, and odds of that contest from what they were originally. (*Id*.) Mr. Juranek alleges that he would not have purchased Omaze's sweepstakes entries, or would have purchased fewer, if he had been aware that Omaze's representations above were false. (*Id*.)

Adriana Carlin learned of Omaze in 2016 in association with a "sweepstakes" for a chance to "Sit Front Row at Kobe Bryant's Last Basketball Game Ever." (*Id*., ¶¶ 127-138.) She visited Omaze's web site, and also received numerous emails from Omaze. Based on the consistent characterization in those solicitations, she believed that Omaze was donating most (i.e., 80-90 %) of her "donations" to charity. Ms. Carlin was also interested in participating for free, but could not do so easily due to Omaze's failure to allow online free entry. (*Id*., ¶ 138.). Even after Omaze allowed online entry, Ms. Carlin could not do so easily due to a cooldown period that only allowed her to do one free entry at a time. (*Id*.). Ms. Carlin spent approximately $650 total purchasing chances to win in Omaze's drawings, generally in amounts of $10-$25. (*Id*., ¶ 134.). She was not aware that free entrants actually received more chances to win then her small "donations." (*Id*., ¶ 136.) If she had been aware of these and other discrepancies, she would have purchased fewer or no "entries" into Omaze's sweepstakes. (*Id*., ¶¶ 137-138.)

## III.   ARGUMENT

### A.   Legal Standard

Under Rule 12(b)(6), the Court determines whether the Complaint contains sufficient factual matter to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all of Plaintiffs' factual allegations as true and draw reasonable inferences in their favor. *Id*; *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

###     B.    The Complaint Properly Alleges Violations of California's UCL.

The UCL prohibits "unfair competition," which is broadly defined as any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. This "sweeping" statute "prohibits wrongful business conduct in whatever context such activity might occur." *In re First All. Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006). Moreover, "[e]ach prong of the UCL is a separate and distinct theory of liability." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). And, thus, "each [prong is] independently actionable." *Siino v. Foresters Life Ins. & Annuity Co.*, 2020 U.S. Dist. LEXIS 178709, at *22-25 (N.D. Cal. Sep. 1, 2020).

####     1.    UCL Unlawful Prong.

The UCL's unlawful prong "borrows violations of other laws," making them "actionable under the UCL." *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 326-27 (Cal. Ct. App. 2012) (internal quotation marks and ellipsis omitted). "Virtually any law or regulation—federal or state, statutory or common law—can serve as a predicate for a section 17200 'unlawful' violation." *Id.* (internal quotation marks and ellipsis omitted). Here, Omaze has violated several laws relating to lotteries in raffles.  Cal. Penal Code § 320 forbids the operation of any private lottery, which is defined as  "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration" regardless of what the scheme is actually called. *Id.* § 319. And, Cal. Penal Code § 320.5 establishes requirements for "raffles," including requirements that 90% of gross receipts go to charity, and prohibiting their conduct on the internet.  While sweepstakes are exempted from those requirements, they are exempted only if they (1) include a general and indiscriminate distribution of tickets, (2) are offered on the same terms and conditions as the tickets for which donations are given, and (3) the scheme does not ***require any of the participants to pay for a chance to win***.  Penal Code § 320.5(m).

### a.      Omaze Violates Laws Forbidding Private Lotteries.

The Complaint plausibly alleges that Omaze violates Cal. Penal Code § 320, and Cal. Penal Code § 320.5. Omaze buys the luxury prizes it distributes. It needs to make enough money to cover the costs of its luxury prizes, generate a return for its investors, pay its personnel, and generate a profit for its owners. To ensure each drawing is profitable, Omaze simply does not distribute the prize until it has sold enough tickets to cover the cost of the prize. For example, after Plaintiffs Knüttel and Juranek purchased entries into an Omaze drawing for a Tesla automobile, Omaze postponed the date of the drawing, while continuing to allow additional people to purchase entries. Because Omaze requires consideration from a substantial portion of, if not most, participants in its drawings (even though it allows some small portion to enter for free), they are illegal private lotteries, not sweepstakes.

Tellingly, Omaze does not address this allegation at all in its motion to dismiss, and it never denies that it needs to sell enough "entries" to make a profit, nor that it postpones drawings until it is assured a profit.  Omaze's only argument on this point is that it always gives the prizes away eventually. But that is irrelevant. The fact it only gives the prizes away once it has received enough paid entries to cover the costs of the prize establishes a violation Cal. Penal Code § 320, and Cal. Penal Code § 320.5. and therefore a violation of the UCL's unlawful prong.[3] *Cf. Shira*, 62 Cal. App. 3d at 459 (explaining that "a promotional scheme is *illegal* where *any* and *all* persons *cannot* participate in a chance for the prize and *some* of the participants who want a chance to win must pay for it") (emphasis in original).

Neither *California Gasoline Retailers v. Regal Petroleum Corp.* ("*Regal*"), 50 Cal. 2d 844, 862 (1958), nor any other case cited by Omaze, supports dismissal because none of those cases involved facts where a sweepstakes operator failed to conduct drawings on published dates unless a minimum number of paid entries had been received.  *Cf. Haskell II*, 965 F. Supp. at 1404 (holding consideration was not required because "[n]o one ever" had to buy goods).

---

[3] Moreover, distributing a prize after the advertised drawing date is not distributing the award "as advertised," and is therefore also a separate violation of California Bus. Prof. Code §§ 17539.1 and 17539.15(j), as described further below, as well as the FAL. Each of these is also an independent violation supporting a claim under the UCL's unlawful prong.

Plaintiffs' allegations that Omaze receives consideration in exchange for increased chances to win prizes are further supported by Omaze's tiered pricing structure and its history of discouraging free entries, which shows that Omaze has not engaged in general and indiscriminate distributions of free entries and thus does not operate sweepstakes. For many years, Omaze made it difficult to enter for free (and difficult even to find the method for doing so), and people who entered for free received fewer entries than those who made the highest donations. (ECF 1, ¶¶ 76-81, 85.) Even the more recent and current versions of Omaze's solicitations lead consumers to believe that they get more entries by paying more money, as Omaze solicits higher amounts in exchange for more entries. (*Id.*, ¶ 89 & Ex. A.)  That tiered structure, in conjunction with Omaze's policy of not holding prize drawings until sufficient amounts of money are received, distinguishes this case from other cases and further supports Plaintiffs' allegations that consumers paid consideration for increased chances to win prizes. *Cf. Shira*, 62 Cal. App. 3d at 459 (explaining that "in order for a promotional giveaway scheme to be *legal any* and *all* persons must be given a ticket free of charge and without any of them paying for the opportunity of a chance to win the prize").

Omaze's alleged conduct is unlawful under the UCL because Omaze has operated, and continues to operate, illegal lotteries (not legal sweepstakes).

**b.      Omaze Fails to Provide Disclosures Required by Law.**

In addition to violating California's prohibition against private lotteries, the Complaint identifies Omaze's failure to disclose sweepstakes information required by law.  While these statutes parallel Plaintiffs' omission claims (and other claims based on omissions), they are a distinct statutory basis for violation of the UCL's unlawful prong.

First, the Complaint alleges that Omaze fails to include a "a clear and conspicuous statement of the no-purchase-or-payment-necessary message" in the official rules for the sweepstakes, as required by Cal. Bus. Prof. Code § 17539.15(b).  While Omaze argues that its disclosures are sufficient, that is factual question, not appropriate for determination in a motion on the pleadings. See section III.3, below.

Similarly, the complaint alleges that Omaze controls the number of solicitations because it controls the number of emails and ads it sends out, but does not publish estimated odds of winning or estimates of the number of entrants as required by Cal. Bus. Prof. Code § 17539.5. Omaze incorrectly argues that this statute does not apply because it does not control the number of entries.  But the statute is triggered "if the number of people solicited" is controlled by the sponsor, not by whether they control the number of entries (which is never within the sponsor's control).  Omaze's motion thus misreads § 17539.5.

Finally, Plaintiffs allege that Omaze does not disclose the dates the final winner will be determined because, when ticket sales have not covered Omaze's costs, Omaze does not conduct the drawings on the dates published.  See Cal. Bus. Prof. Code § 17539.15(j) (requiring sweepstakes sponsors to disclose "the date or dates the final winner will be determined.") Omaze does not address this allegation  squarely.  Instead, it simply states that it publishes dates, as though publishing false dates would comply with this law. It does not, and the Complaint alleges a violation of this statute.

<b>c.      Omaze Violates Anti-Fraud Provisions of California Sweepstakes Laws.</b>

The Complaint also alleges that Omaze violates a statutes forbidding misrepresentations of rules and conditions of sweepstakes.  Again, while these statutes parallel anti-fraud provisions of the other consumer laws asserted, they also represent a distinct statutory basis for violation of the UCL's unlawful prong.

As with 17539.15(j), the Complaint alleges that Omaze fails to comply with § 17539.1(a)(7) by postponing drawings to new dates other than those advertised.  See Cal. Bus. Prof. Code § 17539.1(a)(7) (forbidding a sweepstakes sponsor from "[f]ailing to award and distribute all prizes of the value and type represented")  Again, Omaze does not address this allegation on its merits, instead simply asserting that it has never failed to award a prize.  That response does not detract from Plaintiffs allegation that Omaze awards prizes belatedly.  Given the other statutes relating to sweepstakes—requiring disclosure of drawing dates and accurate terms and odds of winning—it is reasonable to read § 17539.1(a)(7)'s use of "all prizes of the

1  value and type represented" to mean that sweepstakes sponsors must award prizes *on the dates*
2  *and conditions advertised*. Omaze's cursory assertion that it complies with the statute is not
3  sufficient to warrant dismissal.

4      This also supports a violation of Cal. Bus. Prof. Code § 17539.1(a)(3) (forbidding
5  "[m]isrepresenting in any manner the odds of winning any prize"), because the odds of winning
6  are a function of the amount of time the entries are on sale, so the false advertising of the drawing
7  dates also misrepresents the odds of winning.  The Complaint also alleges that Omaze fails to
8  publish the actual odds of winning its prizes, which is inherently a form of misrepresentation.  As
9  such, Omaze's assertion that the Complaint has failed to allege such a misrepresentation ignores
10 the facts alleged.  In the event the Court decides this theory has not been pleaded explicitly
11 enough, Plaintiffs could easily amend the Complaint to include it.

12     Bus. Prof. Code § 17539.1(a)(4) prohibits "[m]isrepresenting in any manner, the rules,
13 terms, or conditions of participation in a contest."  The preamble of § 17539.1 refers to operators
14 of both contests *and sweepstakes*.  Its parent section of code, Bus. Prof. Code § 17539, identifies
15 a "compelling need for more complete disclosure of rules and operations of contests in which
16 money or other valuable consideration may be solicited", and states that §§ 17539.1 "shall be
17 interpreted so as to provide maximum disclosure to and fair treatment of person who may or do
18 enter such contests."  Accordingly, it is plausible to conclude that "contest" in section (a)(4)
19 should apply to both games of skill and sweepstakes.[4]

20     Attempting to rebut these allegations, Omaze tries to paint itself as a charitable
21 foundation.  Again, it is not.  Omaze is a for-profit company backed by venture capital
22 investment.  Venture capital firms are not charities; they invest for profit.  Venture capitalists
23 invested in Omaze because they saw a highly lucrative enterprise: a for-profit private lottery
24 operating under the guise of a legal sweepstakes.

25

26

27

28 [4] Given its reference to "puzzles," plaintiffs do not oppose dismissal of their claims for violation
   of Bus. Prof. Code ¶ 17539.1(a)(1).

Each of the above is a plausible violation of law supporting a claim under the UCL's unlawful prong.  Accordingly, the Court should deny Omaze's motion to dismiss Plaintiffs' claims under the UCL unlawful prong.

### 2.    UCL Unfairness Prong.

Even if Defendants somehow avoided technically violating the law, their conduct violates the UCL's "unfair" prong. *See Rovai v. Select Portfolio Servicing*, LLC, No. 14-cv-1738-BAS-WVG, 2018 U.S. Dist. LEXIS 107764, at \*45 (S.D. Cal. June 27, 2018) ("[A] plaintiff may be able to plausibly plead that a practice which does not facially violate a law nevertheless 'offends an established public policy.'"). Defendants concede this claim by ignoring it in their brief. An "unfair" business practice is one that "offends an established public policy or . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1104 (1996). This can be established by California's "tethering test," which asks whether the public policy at issue is "tethered to specific constitutional, statutory, or regulatory provisions." *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256-57 (2010). Whether a practice is unfair is a question "of fact which requires a review of the evidence" and "thus cannot usually be" determined on the pleadings. *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 240 (Cal. Ct. App. 2006).

Here, the California legislature has identified a public policy against private, for-profit lotteries, and a policy against providing misleading disclosures of dates, rules, and odds when operating sweepstakes.  See, e.g., Bus. Prof. Code § 17539. Defendants' conduct is tethered to specific statutes and recognized as harmful to the public, and is thus "unfair." Even where Omaze has technical reasons why its conduct might not be unlawful (e.g., its argument that § 17539.1(a)(3) applies only to "contests"), it may still be unfair (e.g., because § 17539 identifies a public policy in favor of full, accurate disclosures, and failing to inform participants that Omaze will delay determining a prize winner until it has turned a profit violates that policy).

### 3.    UCL Fraud Prong.

Under the UCL, conduct is "fraudulent" if it is likely to deceive a significant portion of reasonable consumers. *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.

3d 197, 211 (1983). Courts have found this standard satisfied "where 21 to 34 percent of the recipients were deceived." *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995).[5] Unlike common law fraud, this can be shown "even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage." *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1105, 53 Cal. Rptr. 2d 229, 235 (1996). The standard is the same under the CLRA. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

The Complaint alleges a variety of deceptive conduct by Omaze. Omaze's marketing of a gambling enterprise that donates a mere 15% of gross receipts to charity deceives people who buy tickets thinking that they are participating in a charity raffle where 90% of ticket sales go to a charitable cause.  Omaze also deceives people when it presents a ticket scheme so convoluted that participants cannot accurately estimate their chances of winning, which misleads them to make a $10 donation when a free entry would actually have given them a better chance of winning, or simply misleads them into thinking that they have to purchase Omaze "entries" because they haven't been informed that there is a method for entering without payment.

Plaintiffs satisfy Rule 9(b) because they have alleged "the who, what, when, where, and how" of their fraud-based claims.[6] *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  The "who" is Omaze. The "what" is its platform for soliciting gambling bets under the guise of a charity raffle, primarily by using the word "donate" on payment buttons after asking consumers to "support" and "help" particular charities, and by making other consistent representations (by, e.g., labeling ticket entry purchases with "donate," prominently advertising

---

[5] California case law does not define what constitutes a "significant portion" of consumers, but refers to the standard under the Federal Trade Commission act, which is identical. *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 890 (N.D. Cal. 2016) (citing *Lavie*, 105 Cal. App. 4th at 508); *see also, Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 591 (3d Cir. 2002) (accepting "25% figure as sufficient proof that the MNTS product name 'deceives a substantial portion of the intended audience'").

[6] Rule 9(b) does not apply to Plaintiffs' claims under the unlawful and unfair prongs of the UCL because those claims do not turn on whether the alleged conduct was misleading. *See Sanders v. Choice Mfg. Co.*, No. 11-3725 SC, 2011 U.S. Dist. LEXIS 137365, at *27 (N.D. Cal. Nov. 30, 2011) (holding Rule 9(b) did not apply to alleged unlawful conduct not based on fraud).

them as an opportunity to "DONATE TO WIN A ONCE-IN-A-LIFETIME EXPERIENCE, AND SUPPORT AN AMAZING CAUSE," using a landing page slogan that "Good Things Come to Those Who Give" with "When Everybody Donates, Cool Things Happen," all while characterizing them as working "just like a raffle," etc.), which led Plaintiffs and similarly situated consumers to believe that most of the money paid would be transferred to the identified charity. (Dkt. 1, ¶¶ 1, 49, 55, 108, 120, 133, 151, 171, 180 & Ex. A.) The "what" is also the tiered payment structure that led consumers to believe that they would receive more entries if they paid than if they entered for free. (*Id.*, ¶¶ 7, 82, 109, 121, 136, 151, 160, 171, 180 & Ex. A.) The "when" is each time Omaze has solicited a payment in the four years prior to the Complaint, and especially those times since 2018 when it has advertised that an Omaze owned campaign that will have a drawing on a given date, only to postpone that drawing. The "where" is primarily on Omaze's web site, with additional conduct occurring in online marketing, in emails, and at Omaze's headquarters in Los Angeles. And the "how" is by misrepresenting its lotteries—which it initially admitted worked "just like a raffle"—as charitable sweepstakes, even though it won't award the prize unless a minimum amount of consideration is paid and up to 85% of the gross receipts from each campaign go to Omaze and its costs.

To the extent that Omaze attempts to argue that Plaintiffs have failed to meet the heightened pleading standard of Rule 9(b), its arguments fall flat.  The fraud described here is ultimately straightforward: Omaze created a platform that mimicked charity raffles that give 90% of proceeds to charity, while actually keeping almost 90% of those proceeds for itself (at least for Omaze owned sweepstakes). And to be clear, money spent on prizes is money spent on Omaze's behalf because those are operating costs for its business (gambling), that it uses to generate profits for itself and its investors.

Nor should the Court dismiss based on Omaze's assertion that Plaintiffs cannot prove that a "significant portion" of the public be deceived. (ECF 16 at 11.) The "significant portion" standard is satisfied if as little as 25% of the consuming public is deceived.  *William H. Morris Co.*, 66 F.3d at 258.  Further, the question of whether an advertisement or label is deceptive to a reasonable consumer is generally not one that can be resolved at the pleading stage. *Williams v.*

1   *Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008),  (noting that it is a "rare situation" when a

2   Rule 12(b)(6) dismissal would be appropriate).  In fact, the Court should deny Omaze's motion to

3   dismiss on the ground it is a mislabeled motion for summary judgment.  Under the guise of

4   "plausibility," Omaze argues the merits of Plaintiffs' claims at length, introducing copious details

5   of Omaze's web pages and disclosures via judicial notice.  ECF 16 at 3-8 (repeatedly citing

6   exhibits to Siegel Decl., not Complaint); ECF 18.  These assertions are wholly outside the

7   complaint, and therefore cannot serve as a basis to grant a motion to dismiss. *See Khoja v.*

8   *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (facts not in complaint should not

9   be considered basis for dismissing complaint).

10          The case law Omaze cites does not change this analysis.  In *Freeman v. Time, Inc.*, 68 F.

11  3d 285, 289 (9th Cir. 1995), the Court held it implausible that members of the public would be

12  deceived because the two statements—one in large print, the qualifying statement in small print—

13  were immediately adjacent within the same sentence. Here, the conflicting statements

14  characterizing payments to Omaze as donations and those explaining that only 15% goes to

15  charity are not just different sizes, they are far apart and often on entirely different screens or

16  pages. Also, the California legislature outlawed the conduct at issue in *Freeman* three years later,

17  legislatively abrogating many of *Freeman's* holdings.  *Compare, e.g., id.,* at 289 (holding

18  sweepstakes representation that recipient had won was not misleading because qualified by

19  smaller print), with Cal. Bus. Prof. Code § 17539.15(a) (enacted 1998) (making it illegal for

20  sweepstakes solicitations to represent that a person is a winner or has already won a prize). In

21  *Haskell v Time, Inc. ("Haskell I")*, 857 F. Supp. 1392, 1403 (E.D. Cal. 1994), the allegation was

22  that the sweepstakes mailer exaggerated the amount won by failing to disclose it would be taxed

23  and paid in installments. Aside from the fact that both issues were addressed by the mailer,

24  *Haskell* is also a poor comparator because neither of those allegations presented an actual

25  contradiction.  In contrast, the statements "donate $10" to a charity and "donate $1.50" (the true

26  amount donated) are contradictory.  Similarly, *Riley v. Nat'l Fed. Of the Blind of North Carolina*,

27  487 U.S. 781, 799, 108 S. Ct. 2667 (1988), is inapposite because the issue is not just that "at least

28  a portion" of money donated will go to administrative expenses, but that as much as 85% of it

1    will, a fact not presented in *Riley*.  Indeed, *Riley* noted that anti-fraud laws were available to

2    prevent abuse of charitable solicitations, so allowing this case to go forward is entirely in line

3    with that precedent.  *See id.* at 795 ("In striking down this portion of the Act, we do not suggest

4    that States must sit idly by and allow their citizens to be defrauded.").

5            **C.    The Complaint Properly Alleges Violations of California's CLRA.**

6            The Consumer Legal Remedies Act, Cal. Civil Code §§ 1770 et seq., identifies a number

7    of business practices as unfair or deceptive practices. Specifically, the Complaint alleges that

8    Omaze's conduct violates § 1770(a)(1), -(2), -(5), -(9), -(13), -(14) of the CLRA. Among other

9    things, Omaze used the misleading word "donate" in connection with specific charities, thereby

10   suggesting sponsorship or approval by those charities, or association with them, even though

11   Omaze was not hired by them. See Civ. Code § 1770(a)(2) and –(a)(5). It misrepresents

12   "donations" as primarily benefiting the charities identified, even though the overwhelming

13   majority of the financial benefits accrue to Omaze, which misrepresents the characteristics of its

14   services, and ultimately fails to provide the "donation" in the manner understood by the donor.

15   *See id.*, § 1770(a)(5) and –(a)(9).  And by selling "entries" that convey a chance to win prizes in a

16   scheme for distribution by chance that violates the laws governing lotteries, raffles, and

17   sweepstakes, Omaze violates § 1770(a)(14).

18           Omaze's only arguments with respect to the CLRA are that the allegation consumers

19   could be misled are not plausible (ECF 16 at 10-11), and that there is no causal nexus between the

20   alleged activities and any harm. (*Id.*, at 14.) Neither argument is persuasive. As discussed above,

21   see pages 16-17, whether a reasonable consumer could have been misled is a question of fact not

22   suitable for a motion under Rule 12.  With respect to causal nexus, the Complaint adequately—

23   and repeatedly—alleges that Plaintiffs purchased Omaze "entries" in reliance on representations

24   by Omaze, including representations implying that the entire payments were donations, and that

25   the prize winners would be determined on the dates published. See section II.G, above; see also

26   ECF 1 at ¶¶ 112; 114; 122-125; 134-137; 152-153; 159-161; 171-176; 185-188; 191. To the

27   extent Plaintiffs failed to repeat the descriptions provided earlier in the Complaint, they did so

28   only to avoid repetition.  If the Court decides that further detail linking Plaintiff's purchases to

specific statements is needed, Plaintiffs can amend to include recitations of Omaze's solicitations directly for each plaintiff.

### D.    The Complaint Properly Alleges Violations of California's FAL.

The same allegations that support Plaintiffs' claims under the UCL (fraud prong) and CLRA support claims under California's False Advertising Law.  Bus. & Prof. Code §§ 17500, et seq.  Specifically, the Complaint alleges violations of the FAL though Omaze's advertising of money spent on its lottery tickets as "donations," and through its advertisement of specific drawing dates that it did not honor. (See ECF 1, ¶¶ 8-12; 73-75; 105; 116; Ex. B (showing Omaze owned campaign for Telsa Drawing that was postponed)).  As discussed above, Omaze does not address these facts, which must be assumed as true, in its motion to dismiss.

More fundamentally, Omaze falsely advertises its practices when it frames its lotteries as "sweepstakes."  Use of "sweepstakes" implies a promotion undertaken on the promoter's dime, where the prize will be given away whether or not the promotion generates profits sufficient to cover its costs.  Omaze's drawings (at least when Omaze owned), do not fit that description. Omaze buys the luxury prizes it distributes. It needs to make enough money to cover the costs of its luxury prizes, generate a return for its investors, pay its personnel, and generate a profit for its owners. To ensure each drawing is profitable, Omaze simply does not distribute the prize until it has sold enough tickets to cover the cost of the prize.  Granted, Omaze allows *some* people to enter for free. But it cannot and does not allow *everyone* to enter for free.  If it did, it would not make any profit, and it would not be able to pay its venture capital investors. By advertising itself as a sweepstakes, Omaze falsely conveys to consumers that Omaze sweepstakes are just a promotion, when they are, in fact, a means of directly generating profits for Omaze and its investors.

The motion to dismiss Plaintiffs' claims under the FAL (and attendant claims for violation of the UCL's unlawful prong based on violation of the FAL) should be denied.

### E.    The Complaint Properly Alleges an Omissions Claim

Omaze is also wrong when it asserts that Plaintiffs have failed to identify any facts supporting an omission claim.  At minimum, Omaze omitted the possibility that it would refuse to

determine drawing winners on published dates and arbitrarily set a later date, a fact contrary to Omaze's public statements that it would determine the prize winners on the original dates published.  It is also one that Omaze had a duty to disclose, given its statutory obligation to publish the drawing dates. *See* Bus. Prof. Code § 17539.15(j).  Omaze's motion thus fails with respect to Plaintiffs' omission claims.

### F.     The Complaint Properly Alleges Unjust Enrichment

Omaze argues that Plaintiffs' claims for unjust enrichment should be dismissed because California does not recognize unjust enrichment as a cause of action. But the Ninth Circuit recognizes unjust enrichment as a quasi-contract cause of action. *See Astiana v. Hain Celestial Grp., Inc.,* 783 F.3d 753, 762-63 (9th Cir. 2015) (reversing dismissal of unjust enrichment claim) (citing Fed. R. Civ. P. 8(d)(2)); *see also Goldman v. Bayer AG*, No. 17-cv-0647-PJH, 2017 U.S. Dist. LEXIS 117117, at *23 (N.D. Cal. July 26, 2017) ("Unjust enrichment and restitution describe the theory underlying a claim that the defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request' and it is the return of that benefit which is the remedy sought in a quasi-contract action.") (citing *Astiana,* 783 F.3d. at 762-63).

Nor is it true that Plaintiffs received the benefit of the bargain they made.  Merely entering them into a prize drawing is not enough to satisfy the agreement Omaze entered into, even if only quasi-contractual.  The Complaint alleges that Omaze failed to follow through on promises made to Plaintiffs regarding donation to charity, drawing prizes on published dates (for at least Knüttel and Juranek), and, by extension, failing to operate the "sweepstakes" in compliance with the published rules and odds (to the extent implied by the published drawing dates). In each of these cases, Plaintiffs did not receive the benefits for which they bargained.  Thus, *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008), and *Derbaremdiker v. Applebee's*, No. 12-CV-01058 KAM, 2012 WL 4482057 (E.D.N.Y. Sept. 26, 2012), are inapposite.

### G.     Plaintiffs Have Standing

The Complaint alleges facts establishing standing.  To obtain Article III standing, a plaintiff must allege (1) an injury-in-fact; (2) that is traceable to the defendant; and (3) is capable of being redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

1 (1992). Plaintiffs have done so.  Specifically, the Complaint alleges that Omaze obtained money

2 from Plaintiffs by running an illegal lottery and through various misleading statements, including

3 statements indicating that Plaintiffs were donating to charity, and notices that failed to comply

4 with California law due to lack of estimated odds and inaccurate drawing dates (for at least

5 Plaintiffs Knüttel and Juranek).  Being subjected to illegal business practices is a harm per se.

6 See *Davidson v. Kimberly-Clark Corp.*, 873 F.3d 1103, 1115 (9th Cir. 2017) (the possibility of

7 ongoing, unremedied misconduct creates standing for injunctive relief).  Plaintiffs have also

8 alleged sufficient facts to show they will continue to be exposed to this illegal and unfair conduct,

9 and therefore have standing to seek to enjoin it. *Id.*

10      Citing *In re Sony Gaming Networks*, 903 F. Supp. 2d 942, 965 (S.D. Cal. 2012), Omaze

11 suggests that Plaintiffs lack statutory standing under the UCL and FAL because they would have

12 donated the same amount of money anyway.  This argument's flaws are two-fold.  First, Plaintiffs

13 never said they would have donated the same amount of money absent Omaze's conduct; to the

14 contrary, the Complaint clearly alleges that each plaintiff would not have purchased entries, or

15 would have purchased fewer, if they were aware of Omaze's misconduct and misrepresentations.

16 (ECF 1 at ¶¶ 112; 114; 122-125; 134-137; 152-153; 159-161; 171-176; 185-188; 191.)  Second, a

17 fraud that deprives a person of money they would have donated still harms the victim; at

18 minimum, the fraud deprives the person of the money they were going to donate, because the

19 donor needs to spend that amount of money again in order to obtain the benefit they wanted (i.e.,

20 the actual charitable donation), which is a "tangible increased cost or burden" under *Sony*.  To the

21 extent the Plaintiffs donated, they did so to charity, not to Omaze and its venture backers.

22 Frustrating Plaintiffs' attempts to do so is a concrete harm, as Omaze itself admits when it argues

23 elsewhere that "the satisfaction of donating to charity" is a benefit of a donation. See ECF 16 at

24 19. Omaze's misconduct has deprived Plaintiffs of that benefit.

25     **H.**    **The Complaint Does Not Present First Amendment Concerns**

26     Omaze mistakenly argues that the Supreme Court decision in *Riley* requires dismissal.

27 *Riley*, which addressed the constitutionality of a statute compelling speech, is inapposite here for

28 the simple reason that this case does not involve a statute that compels any speech.  Furthermore,

the compelled speech at issue in *Riley*—which predated the internet—required disclosure during in-person or phone solicitations.  Here, in contrast, the disclosures sought would be made in Omaze's emails or web pages.  And in weighing the burden of this on Omaze, the Court should note that Omaze already claims to disclose the requested information to each person solicited; its only objection is to doing so in a way that is likely to be noticed (as opposed to in fine print).

Even if the Complaint sought an injunction seeking disclosures paralleling those at issue in *Riley*, that alone is not a basis for dismissing *all claims* as Omaze requests.  And even if Omaze's request were limited to dismissal of the specific remedy requested, its motion is premature. For instance, if a jury were to return a verdict that Omaze had engaged in fraud, that verdict would be a concrete finding that may justify the requested remedy, thereby differentiating it from the mere possibility of fraud raised in *Riley*.  *See, e.g., Riley,* 487 U.S. at 795 ("In striking down this portion of the Act, we do not suggest that States must sit idly by and allow their citizens to be defrauded.").  *Riley* noted that enforcement of anti-fraud laws were available to prevent fraud, so allowing this case to go forward is entirely in line with that precedent.

## I.    Facts Pre-Dating the Claims Do Not Violate the Statute of Limitations

Omaze argues last that the Complaint should be dismissed or stricken to the extent it "improperly rests on conduct outside of the applicable limitations period." ECF 16 at 25.  This request is unnecessary. To be clear, the Complaint recites a thorough history of Omaze's conduct, dating back prior to the limitation period.  But these are background facts, not claims.  SEC v. Sabhlok, No. C 08-04238 CRB, 2009 U.S. Dist. LEXIS 138804, at *29 (N.D. Cal. Feb. 18, 2009) For example, Omaze's statement on its web site that its drawings worked "just like a raffle"—a form of legal private lottery—is an admission relevant to Omaze's current assertion that its drawings are not lotteries. (*Compare* ECF 1 at ¶¶ 5 & 65 *with* ECF 16 at 16.) That does not mean Plaintiffs claims are directed to conduct prior to the limitation period, and no dismissal (nor striking of facts) is required. In any event, the motion to dismiss claims as time-barred is premature.  The appropriate statute of limitations can be applied when liability and damages are determined, or during class certification. See, e.g., *SEC v. Sabhlok*, No. C 08-04238 CRB, 2009 U.S. Dist. LEXIS 138804, at *29 (N.D. Cal. Feb. 18, 2009)  (denying motion to strike where

"carving out" claims prior to limitations period would not result in dismissal of cause of action); see also *City of L.A. v. Citigroup Inc.*, 24 F. Supp. 3d 940, 951 (C.D. Cal. 2014) (denying motion to strike where past conduct supported allegations of ongoing violations of law).

### J.     If Necessary, the Court Should Grant Leave to Amend

Alternatively, in the event that the Court deems the Complaint deficient, Plaintiffs respectfully request leave to amend.  Such amendment will not be futile, particularly where deemed necessary to tie the Plaintiffs' claims and experiences to the broader allegations of Omaze's conduct, or to address concerns under Rule 9(b).  In addition, Plaintiffs can provide additional allegations regarding the events that motivated Omaze to adopt its "Omaze owned" campaigns, the for-profit nature of its business model and its role in obtaining venture capital, and Omaze's settlement of an California Attorney General investigation that supports the inference that Omaze's disclosures of free entry methods has not complied with California's sweepstakes laws.

### IV.   CONCLUSION

For the foregoing reasons, this Court should deny Defendant's motion to dismiss.

Dated:  July 6, 2021                       **GUTRIDE SAFIER LLP**

                                       /s/ Anthony J. Patek
                                       Anthony J. Patek, Esq.
                                       100 Pine Street, Suite 1250
                                       San Francisco, California 94111

                                       Attorneys for Plaintiffs